Davis, Judge,
delivered the opinion of the court:
This action involves thirty-two tracts of land[2] claimed to have been invaded by overflights of Government aircraft which appropriated easements of flight for which just compensation must be paid. The Trial Commissioner has made extensive findings and the plaintiffs have taken no exception to them.[3] The Government admits a taking with respect to some of the tracts,[4] but it hotly disputes that this is true of the others; it challenges, also, the Trial Commissioner’s *614 findings on diminution of value. The suit has been tried under the legal standard that a compensable taking occurs when there are regular and frequent overflights of aircraft, of the types in this case, at altitudes of less than 500 feet, which cause damage to the owners of land. See United States v. Causby, 328 U.S. 256, 263-64 (1946); Aaron v. United States, 160 Ct. Cl. 295, 300, 311 F. 2d 798, 801 (1963). See, generally, cases cited in Jensen v. United States, 158 Ct. Cl. 333, 337 n. 6, 305 F. 2d 444, 446, n. 6 (1962).
Clinton-Sherman Air Force Base is in Washita County, Oklahoma; the lands involved are located at the north and south ends of the Base’s single runway. Originally a naval air training station, the field was deactivated at the end of World War II. In later years, its single north-south runway was lengthened to accommodate large, heavy jet aircraft. It has since been operated as a base for Strategic Air Command B-52 jet bombers, KC-135 jet tankers, and supporting units; it is utilized also by nonjet military aircraft. The first jet flights were begun in 1958; in that year and the next, flights ranged from four to fifty per month. Thereafter, the number of flights increased to an average of 275 per month. Apart from the operations of these giant multi jet aircraft, there were practice flights of C-124 piston-driven planes and other non jets which used the field for training purposes. In 1960, the air traffic, jet and nonjet, ranged from 1,178 to 2,362 operations per month (these figures include normal landings and take-offs as well as practice maneuvers).
Depending on the wind, normal landings and take-offs will proceed either to the north or to the south (the direction of the runway). Practice operations are of three general types. There is, first, the maneuver known as “touch-and-go”: the aircraft approaches for a normal landing, then, after touching the runway and while still rolling, power is reapplied and the aircraft takes off, circles the field to the west and then repeats the maneuver. After 1959, this procedure was discontinued for the B-52 and KC-135, but it still applies to the C-124. Second, there is the low approach which is like “touch-and-go” except that the plane does not *615 actually set down on the field. In the third maneuver, the minimum-interval take-off, three jet bombers or tankers take off at very short intervals — fifteen seconds — and one flies directly ahead while the aircraft that follow, to avoid jet wash, fly to the east; the second plane goes 10 degrees to the east and the third 20 degrees to the east. Practice low approaches occur rather frequently (two or three times a week); minimum-interval take-offs are used from time to time.
To assist in the supervision of landing operations, a radar ground control approach system (GCA) has been set up. It is utilized in approximately 35% of all landings and 90-95% of the landings of the multi jet aircraft. The flight path established by GCA runs upward at an angle of 2.5 degrees over the projected centerline of the runway from a point 750 feet before the end of the runway. Below this imaginary line is another, the lower safety limit, which runs at specified distances beneath the GCA flight path. When an aircraft varies from the flight path, as detected by radar, ground instructions are relayed to the pilot so that he may correct his approach;[5] when the aircraft encroaches upon the lower safety limit, a missed-approach is directed. The pilot, himself, controls the final landing approach except, of course, when field personnel order him not to land.
At each end of the runway is a 1000 foot clear zone where there are no structures, a safety area upon which aircraft do not land. A fan-shaped clearance easement area, or approach zone, begins at the end of the clear zone and extends for 5,000 feet; at its outward limit, it is approximately 3,250 feet wide.' Over this area, the Government has acquired an easement which gives it the right to remove structures and vegetation above the glide angle plane (another imaginary line rising to a height of 200 feet). This easement is intended to insure that visibility remain unobstructed above the glide angle plane.
*616 Plaintiffs’ lands lie in the vicinity of the Base at the north or south ends of the runway. Many of the tracts are wholly or partially within the approach zone,[6] others are within a half-mile of the projected centerline of the runway, either to the east or to the west. The relative position of each of the 32 tracts is set forth in finding 4.
The Trial Commissioner has found that permanent easements of flight have been taken with respect to all but five of the tracts (see footnote 3, supra) because of the overflights of jet and non jet aircraft in taking off and landing at altitudes below 500 feet. As a result of these flights there are the usual disturbances. Plaintiffs complain, and the Commissioner has found, that the noise is so loud that it makes conversation impossible; television reception and telephonic communications are interrupted; when the aircraft fly overhead, the structures on the land rattle and vibrate and certain people become terrified (especially children and visitors); particularly disturbing are the practice operations which proceed continuously for rather long intervals. The decrease in market value found by the Commissioner for each of the tracts is set forth in finding 17. Since plaintiffs do not challenge these figures, we need consider only whether they are too high, not whether they give inadequate compensation. Accordingly, if the findings withstand defendant’s exceptions, the plaintiffs will recover the amounts determined by the Commissioner.
In this, as in all cases in which a Commissioner has carefully weighed conflicting evidence, the burden of sustaining exceptions to the findings is far from slight. We start with the double directive that due regard must be given to the Commissioner’s opportunity to judge the credibility of the witnesses and that his factual findings “will be presumed to be correct.” Rule 48. That presumption is dissipated only *617 by a strong affirmative showing. Where, as often happens, what appears to be a sound objection to a finding is answered by an equally sound explanation in support of it, the presumption will carry the day. Where the specific testimony of witnesses, believed by the trier-of-fact, is countered only by the advocate’s theoretical arguments which may or may not be correct, we must ordinarily accept the trier’s evaluation. The same is true where the Commissioner has preferred one witness to an event (or set of witnesses) over another. Stronger assaults must be launched before the recommended findings can be overthrown. This is not to abdicate the court’s function as the ultimate finder of the facts. In a fallible and busy world, all that can be required for the due administration of justice and the foundation of a judgment is that, when the balance is close, we rely on the appraisal of an unprejudiced trier who has followed a process which will generally bring about a correct determination.
In this light and by this standard, we examine defendant’s exceptions. They are of two types: (1) For those tracts as to which it disputes the taking of an avigation easement (tracts 6, 7 and 10 on the north end, and tracts 13, 15, 21, 22, 24, 26, 28, 29, 30, 31, 32 and 33 at the south end of the field), defendant claims that overflights did not occur or if they did they were over 500 feet; and (2) with respect to all tracts, defendant claims that the Commissioner’s findings of diminution of value were excessive.
I
We cannot accept defendant’s contention that no easements were taken over the fifteen tracts in which that issue is still alive.
1. Tracts 6, 10, 13, 15, 21, 24, and 26 lie east of the projected centerline of the runway. There was testimony of frequent flights below 500 feet over these tracts. Defendant maintains, however, that on take-offs and landings the pilots were instructed to fly in a straight line — north or south— regardless of wind direction; and that, if they did turn, it would be to the west in order to avoid a more populated area *618 to the east.[7] Tbe pilots testified that they followed instructions. On the other hand, the pilots were not and could not be sure over what land they were flying; they were concerned on take-offs primarily with time and speed rather than with direction. There are also certain other facts which do not square with defendant’s contention that the aircraft always fly in a direct north-south straight line. The fan-shaped approach zone seems to indicate that the jets do not proceed solely in a straight line. The Commissioner has found that the jets take-off into the wind; for the purpose of attempting to avoid the effects of crosswinds, as well as for the efficiency of a heavily loaded jet bomber or tanker, that is the safest course. The fact seems to be that the large jet aircraft turn to the east when the direction of the wind calls upon them to do so; defendant admits that that might occur for one quarter of the time. The “human factor” suggests that such deviations are not uncommon. Moreover, when pilots perform minimum-interval practice take-offs, the flight pattern of the following-aircraft is always to the east in order to avoid the jet wash of the planes ahead. When landing, although under GCA supervision most of the time, the big jets make use of the entire area of the approach zone. There is nothing rigid in the GCA system; the pilot himself controls the landing; it is possible for a landing to be made even when the aircraft has strayed a good deal .to the east or to the west at a comparatively short distance from touchdown. The direction of approach, important as it is, does not appear to be as critical as the height of the aircraft at a given distance from the field. All of this, taken together with the eyewitness testimony, supports the Commissioner’s findings.
*619 2. Defendant has focused on tracts 6 and 7 to show that the jets would not fly over these areas in landing. Tract 6 lies approximately 1% miles to the north of the field and y2 mile east of the projected centerline of the runway; tract 7 is closer to the field and about the same distance from the centerline, but to the west of it. Defendant maintains that for heavy aircraft to land, having flown over either of these tracts, there would be little time to bring the plane on a straight line over the runway; such a landing could be made but it would be a considerable strain on the big jets. This argument makes sense, but at most it applies only to landings. Upon consideration of all the activities which go on at the Base, we are not persuaded that the Government’s operations were insufficient to take an avigation easement over these parcels. For example, defendant admits that aircraft fly over tract 7 when circling the field and during practice maneuvers. The Commissioner has found that there are flights over tract 6 at practice sessions. There are also flights over both areas on take-off. The overflights necessary for a taking to exist must be regular and frequent; they need not occur from every conceivable operation going on at the Base.
3. Defendant also argues that, even if there were flights over some or all of the tracts still in issue, they would take place at altitudes above 500 feet. Heavy reliance.is placed on the purported rapid rate of climb of the jets on take-off; each aircraft, defendant asserts, climbs to over 500 feet within one mile of the airstrip when heavily loaded, and when not so loaded often reaches that altitude before crossing the field boundary. We are not convinced that the situation is as plain as defendant makes it. The rate of climb for jet take-off is, among other things, a function of the weight of the load and the weather conditions. Temperature and barometric pressures affect the efficiency of jet engines. As contrasted to landings, which are often under GCA, take-offs, at least as to rate of climb, are not supervised from the ground. The Trial Commissioner has found that “with the heavier loads, or under adverse weather conditions, the aircraft require more runway, and gain altitude more slowly after take-off” and that “the height of aircraft over any *620 particular point will vary with weather conditions and the speed attained in the particular take-off operation.” The GCA flight path or lower safety limit is below 500 feet for tracts 6, 7, 13,15, 21, 22, 24, 26, 29, 30 and 33 — eleven out of the fifteen parcels in dispute. On landing, therefore, the aircraft are likely to be under 500 feet in flying over those tracts. We think that the findings of the Commissioner as to the flying altitude over those tracts and the others in issue are justified by the record.
II
On valuation, it is conceded that those parcels directly under the line of flight have suffered some diminution of market value; defendant urges, however, that the Commissioner’s allowances are excessive. It is also argued that the owners of the other tracts, those to the east and west of the GCA flight path, should be granted no compensation. Again, defendant has failed to persuade us that the Commissioner erred.
1. One claim is that there is no “pattern” to the Commissioner’s findings of decrease in value; the Government says that they are especially “erratic” as to the tracts to the south of the field. We take the defendant to mean that it can discover no uniform percentage of per-acre decrease in value among the tracts which are situated in the same general area. Upon analysis this does not seem unusual; it is accounted for by the differences in location from the line of flight and the consequent frequency of overflights. Added to this are the divergences in the kind, and extent, of improvements on the various parcels. The Commissioner also took special note that “the quality of land varies considerably within the area, which means that very valuable land and relatively poor land often exist in close proximity.” The findings on compensation reflect these material differences.
2. Exception is taken to the Commissioner’s failure to give greater weight to certain sales which, the Government urges, show the lack of diminution of market value. Tract 7 was sold in May 1959 for $175 per acre. Defendant says that this compares favorably with two other sales in the vicinity. *621 These are sales numbered 11 and 14, described in finding 14. In sale 11, the land was sold for $154.17 per acre, but the seller was in financial difficulty. Sale 14 was made in 1954 for $150.00 per acre; that amount as adjusted to encompass generally rising land values would equal $190.00 per acre at the time of the first jet flights. These transactions fall short of proving defendant’s point. Since the improvements on tract 7 were “far above average,” it was wholly reasonable for the Commissioner to find that that parcel was worth more than $175.00 and had declined in value to the extent of $25.00 per acre.'
Defendant also points to sales numbered 18, 17, 18, and 19 (also described in finding 14), which involved parcels near the tracts in issue. It is said that “good” prices were obtained in these sales even though the lands must necessarily have suffered from the same noise and vibration as our tracts; this shows, the Government claims, that there was actually no depression in market value in the neighborhood of the Base. There was, no doubt, a general increase in land prices in the region, but the problem for us is whether that general increase was retarded as to areas affected by the jets. The cited sales tend to show the market price for the respective parcels either before or after the first jet flights— there is no sale which by its chronology would give us information of the value of a tract both before and after the jet aircraft began their operations at Clinton-Sherman. At best, the sales evidence is inconclusive. Plaintiffs direct us to sale 3 in which land not subject to jet flights sold unimproved for $313.00 per acre in 1961 — significantly more than the sales prices of the land in vicinity of the Base (sale 13, $150.00 per acre; sale 17, $200.00 per acre; sale 18, $250.00 per acre; sale 19, $250.00 per acre).
3. The qualifications of the expert witnesses on both sides have not been put in issue. The Government feels, however, that its appraisers were more nearly accurate than plaintiffs’. With respect to tracts outside the approach zone we think that the Commissioner properly gave little weight to the testimony of defendant’s appraisers. Apparently, they had determined that there was no diminution of value as to all but eight of the parcels on the basis of advice that the *622 owners, as a matter of law, could not recover since their lands were not subject to easements of flight. That erroneous advice fatally infected the defendant’s expert testimony as to all the parcels beyond the approach zone.
As for the tracts which defendant admits did suffer some loss of value, it urges that the lower figures of its experts should be taken. It refers us to testimony of some of the plaintiffs that they would not be willing to sell their properties and to evidence that some of the owners have made improvements after the jets began operating at the field. These facts are neutral on the issue of valuation. It is possible that the owners would not wish to sell their land for the reason that it had decreased in value; or it might be that the land was an ancestral or long-continued home. Whatever the reason be, in the absence of proof that the owners thought their land to be of equal value 'before and after the flights, these facts do not persuade us to accept the Government’s valuations. Nor do we think that adding improvements necessarily means that land has increased in value only slightly or not at all. The worth of the land may have decreased drastically for homestead purposes, but it may have maintained its status for agricultural uses; there would thus be a net decrease in total value.[8]
Our conclusion is that the defendant has not overcome the Trial Commissioner’s findings, either as to taking or as to valuation'. The plaintiffs for whom awards were recommended are entitled to recover the amounts found by the Commissioner.
Judgment will be held in abeyance with respect to tract 19 (E. E. Smith) the owner of which died shortly before the trial; we will have to await the prompt substitution of a proper party. Judgment will be entered as to the plaintiffs owning tracts 1-8, 10, 13, 15, 17-18, 20-26, 28-33 as their *623 interests appear and in accordance with the schedule of compensation in column III of finding 17. In each instance there will 'be added a sum computed at 4 per cent per annum from July 1, 1959, to date of payment, to compensate for delay in payment, as part of just compensation. As a condition of this judgment, the respective plaintiffs will convey easements to defendant which grant the right to fly aircraft of any kind[9] over their respective tracts at elevations equal to or above the glide angle plane, and for those tracts not within the clearance easement area at heights measured by the same ratio as the glide angle plane. With respect to the plaintiffs owning tracts 9,11,12,14, and 27, the petition is dismissed and judgment is entered for defendant.
BINDINGS OB BACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The individual plaintiffs[10] are all citizens of the United States and residents of Oklahoma. At all times pertinent to this action, they have been owners of various tracts of land located in the immediate vicinity of Clinton-Sherman Air Force Base, near Burns Flat, in Washita County, Okla. A brief summary of the basis of the claim filed against defendant is set out with respect to each tract. The tracts owned by the respective plaintiffs and the existing impro.ve- *624 ments as of the date of the alleged taking are also included unless otherwise indicated.
Tract No. 1: Plaintiffs Leo J. Merz (28) and Louis T. Merz (29) are owners of this 160-acre tract, described as Southwest Quarter of Section 3, Township 10 North, Range 19 West. This tract is subject to mortgage to Prudential Insurance Company of America. Plaintiffs have lived on the property continuously since 1948. The house formerly was located near the center of the tract, almost directly in line with the runway, but it was moved to the southwest corner of the tract in connection with acquisition of clearance easements. The land is very level, tillable, upland soil, with no waste. The soil is a sandy loam, very suitable for raising cotton. The farm has a 67-acre cotton allotment.
Improvements consist of an old, two-story frame house, 16 by 26 feet, two granaries, and other sheds and outbuildings. This tract is located directly in line with the runway at the north end and is the closest tract to the runway. Jet aircraft pass over the property at altitudes of approximately 100 feet on take-off and 50 feet on landing. On practice landings or low approaches, aircraft often pass over the house at similar altitudes. Auto parking is prohibited on the highway along the south boundary of this tract because of low-flying aircraft. The noise from aircraft operations is particularly deafening, and vibration in the house especially severe, because of the extremely low altitudes at which they fly over this land. Plaintiffs are constantly disturbed and frequently awakened at night by jet aircraft landing and taking off.
The location of this tract with respect to the flight pattern of jet aircraft has substantially destroyed its value as a location for a home, and the extremely low altitudes at which planes customarily fly over the property adversely affects normal farming operations.
Tract No. 2: Plaintiff John Kerkhoff (23) owns and occupies the 200-acre tract described as West Half of Northwest Quarter of Section 3, Lot 1, and South Half, Northeast Quarter of Section 4, Township 10 North, Range 19 West. He has owned the property since 1940, and has lived on it continuously for 60 years. Mr. and Mrs. Kerkhoff live on the *625 property, which, for the past 2 years, has been farmed by his son-in-law. Approximately 75 acres of the tract is rough land and grass pasture, traversed by a creek that provides an excellent supply of water. The balance of the land is good cotton land, which is also suitable for other crops. The cotton allotment has been 57 acres. This tract has been used for a general diversified farming operation, which includes raising cotton, feed crops, wheat, and livestock.
Improvements consist of a five-room modern, frame house, 45 by 15 feet, a good two-car garage 20 by 20 feet, a large metal-covered barn 30 by 40 feet, a smokehouse 12 by 15 feet, and other sheds and storage buildings. The improvements are located in the western portion of the east 80-acre tract, slightly west of the extended center line of the runway.
Nearly all of the jet aircraft taking off from and landing at Clinton-Sherman Air Force Base pass over this tract. Frequent flights pass directly over the house, especially on take-off. Jet planes pass over this tract at altitudes of from 150 to 300 feet, and generally lower when landing. The tankers are the lowest and noisiest, especially on take-off. The noise from practice landings and low approaches is also very disturbing. This is especially true when they appear to be landing, but, instead, “give it the gas,” and do not actually land.
The noise of large jet aircraft passing over makes conversation impossible, and makes it disagreeable to live on the premises. There is considerable disturbance when the planes fly over any portion of the land, and it is especially bad when they pass directly overhead. Flights occur at all hours of the day and night, and plaintiff’s sleep is often disturbed. Operations often begin very early in the morning. Frequently, jet planes are passing over at such short intervals that the disturbance is practically continuous.
Tract No. 8: Plaintiffs W. E. Guthrie (15) and Bernice Guthrie (11) own the 320-acre tract described as East Half, Northwest Quarter, and West Half of Northeast Quarter, Section 3, Township 10 North, Range 19 West; and Southwest Quarter of Section 34, Township 11 North, Range 19 West. Plaintiffs have owned the south portion of this tract *626 since 1942, and acquired the 160-acre tract in Section 34 in the year 1957. Plaintiffs occupy the property with their three youngest children.
Plaintiffs conduct a general farming and dairy operation on the tract. About 50 percent of the land is level and tillable. The balance, and especially .the rough land along a creek that crosses the tract, is suitable for pasture. The creek is never dry, and provides a reliable source of stock water for dairy cattle.. The farm is well balanced in productive capacity for dairy purposes.
The improvements consist of a two-story, six-room, frame house in good repair, 28 by 30 feet, with addition 7 by 13 feet, and porch. There is a dairy barn 17 by 35 feet, of masonry construction, built to Grade A specifications, a hay barn 30 by 24 feet, a garage 10 by 18 feet, a cellar, chicken house, calf shed, and tin shed to protect the dairy cows in bad weather. On the northern tract there are some old improvements which were there when it was purchased, consisting of a frame dwelling 24 by 30 feet, a cellar, sheds, and other structures. Occasionally the second house is rented to a tenant, but it is vacant most of the time.
This property is directly north of the runway, and the house is about one and a quarter miles from the end of the runway, almost exactly in line with its extended center line. The largest multijet bombers and tankers pass directly over the house on taking off from and landing at the Base, at elevations of between 200 and 300 feet. The family is often awakened between 1 and 3 a.m. by the jets passing overhead. An average of 10 to 15 of the large jets fly over in a day, except on days when practice landing operations are in progress, when there are as many as three or four in the air constantly, circling and approaching for simulated landings.
The noise from the large jets is deafening at this location, rendering conversation and telephoning impossible. The house and even the masonry bam vibrate and shake. The children are frightened by the noise and afraid to play outside when the jets are operating. The family lives in fear of a possible crash of one of the large jet bombers or tankers, especially at night.
*627 The large jets normally are louder on takeoff, but they are especially disturbing when they approach the runway as if to land but reapply power and resume altitude.
The jet operations have rendered this tract an undesirable place to live, and an undesirable location for a dairy operation.
Tract No. 1¡.: Plaintiff Buby Peterson (33) owns this 160-acre tract, described as Northwest Quarter of Section 34, Township 11 North, Bange 19 West. This tract is subject to a mortgage to Prudential Insurance Company of America. Plaintiff Kenneth M. Peterson (32) died before this action was filed, and the cause has been dismissed as to him. Mrs. Peterson has lived on the property for 40 years.
The land is fairly good cotton land, a sandy loam. About half the tract is in cultivation and the balance in pasture and the soil bank. The farm has a 38.6-acre cotton base. Improvements include a three-room, modern house, 17 by 32 feet, which is occupied by the owner, an old four-room tenant house, a barn 15 by 27 feet, a chicken house, and other sheds and outbuildings. The main residence is in good condition and is located in the northeast corner of the tract.
Jet aircraft pass over this tract and over the house at altitudes below 500 feet. Plaintiff testified that sometimes it appears that they barely clear some very tall trees in the yard. The noise and vibration is very disturbing, especially at night. Jet operations go on at all hours of the night and early morning. Since plaintiff works until 10:30 p.m. and does her housework after that, she goes to bed about midnight. She is often disturbed between that time and 6 a.m.
Tract No. 5: Plaintiff Frank F. Morgan (30) owns this 120-acre tract, described as West Half of Northeast Quarter of Section 34 and Northeast Quarter of Southwest Quarter, Section 27, Township 11 North, Bange 19 West. Plaintiff and his wife have occupied the premises, since 1945. They have a daughter who was 5 years old at time of the trial. The land is in two noncontiguous parcels, about a quarter mile apart, operated as a unit. The land is slightly rolling, terraced to stop erosion. Soil is a sandy loam. Some 35 acres is in pasture, and the balance is used for raising cotton and feed crops. The cotton allotment is 35 acres. Plaintiff *628 farms other rented land together with this tract owned by him. Improvements consist of a five-room frame house, 14 by 38 feet with an addition 9 by 28 feet, recently remodeled and covered outside with asbestos shingles. There is a barn 10 by 18 feet, garage 12 by 25 feet, cellar 9 by 12 feet, and other utility buildings and sheds used in connection with farming operations.
The jet bombers and tankers fly over the land and occasionally over the house at altitudes less than 500 feet. Most of them go by to the west of the house, but so close that the house vibrates. The family is frequently awakened by the noise, and plaintiff’s daughter is frightened by the large jets passing low overhead. Plaintiff Morgan testified that he counted 24 flights by the large jet bombers and tankers in the period between 5:30 p.m. and 9:15 p.m. on the day before trial. He further stated that this was above the average but less than the maximum number which have passed during a similar period.
Tract No. 6: Plaintiff Leo Hoffman (18) owns this 160-acre tract, described as East Half of Northeast Quarter, Section 34, and West Half of Northwest Quarter (less 2 acres for cemetery) of Section 35, Township 11 North, Range 19 West. This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas. Plaintiff has lived there since 1946. The family now consists of Mr. and Mrs. Hoffman, their four children having grown and moved away. The land is good cropland, somewhat undulating, except for about 40 acres which is pasture. It has been terraced to stop erosion. This plaintiff conducts general diversified farming operations on the tract, including cotton, wheat, and livestock. The land has an allotment of 40 acres for cotton and 9 acres for wheat. Plaintiff raises a total of 80 acres of cotton on this and rented land.
Improvements consist of a four-room, cement block, modem house 14 by 26 feet, with two frame additions; a two-car frame garage 24 by 24 feet, a barn 24 by 30 feet, a two-room frame house, a wash house, and several other sheds and buildings used in connection with farming operations.
Jet aircraft from the Base fly over the property at altitudes of 400 to 450 feet. Since the improvements are in the east *629 portion of tbe tract, tlie flights are mostly to the west of the house itself, but sometimes the aircraft fly directly overhead. Plaintiff and his wife experience considerable noise and vibration in their home, even though planes are passing over the tract to the west of the house, and they are disturbed at night. After take-off, and when heavily loaded, the multijet aircraft pass over this property. On landing, and in practice landing operations, they often pass over the west portion of the tract.
Tract No. 7: Plaintiff J. E. Guthrie (13) was the owner of this 120-acre tract, described as Lot 2, Section 4, Township 10 North, Range 19 West; and West Half of Southeast Quarter, Section 33, Township 11 North, Range 19 West. Plaintiff was the owner of this tract at the time of the taking of a flight easement over it. The property was sold to O. R. Haggard in 1959.
The land is level to gently rolling, having been terraced to control erosion. Twenty acres are in pasture and the rest in cultivation. Crop allotments include 40 acres for cotton and 15 acres for wheat. Soil is sandy loam, suitable for the crops being raised.
Improvements consist of a very good five-room, modern house, 26 by 50 feet, with a porch 8 by 21 feet. The home was completely remodeled in 1957 at a cost of $12,000, and a den and bedroom added. Other improvements include a garage 12 by 16 feet, bam 10 by 31 feet, cellar, granary, chicken house, and other sheds and structures.
Jet aircraft commenced to fly over the property at low altitudes after the remodeling had been completed. Plaintiff and his family, consisting of a wife and son, intended to continue to live there permanently, but, due to the disturbance from the aircraft, decided to sell the property.
Jet aircraft pass over this tract at altitudes of less than 500 feet. Plaintiff estimated that such planes fly over this property at approximately 200 feet. Most flights over the property are in connection with practice landings or low approaches, the tract being somewhat west of the extension of the runway and about a mile north of the north end of the runway. Depending upon the direction of the wind, the aircraft often would pass directly over the house, both on *630 take-off and landing, and in making a circle to tbe west for repeated practice landings. Wlien the aircraft were passing over the house, conversation was impossible in the house or yard. Often, when several jet planes were circling, practicing landings, the disturbance would continue for long periods. Plaintiff and his family were disturbed and awakened often at all hours of the night. The purchaser does not live on the property, and since the property was sold there have been two tenants on the property.
Tract No. 8: Plaintiffs Goldie McAdams (27) and Fines M. McAdams (26), mother and son, own this 120-acre tract, described as West Half of Southwest Quarter and Southeast Quarter of Southwest Quarter of Section 27, Township 11 North, Range 19 West. The mother has lived on the property for 55 years, and it is now being farmed by her son.
The land is gently rolling, all tillable, terraced to control erosion. It is adaptable to the crops generally grown in the area, cotton and grains. Cotton allotment has been 62 acres, and the wheat allotment 15 acres.
The improvements are located on the south side of the tract, almost directly in line with the extension of the runway. The residence is a three-room frame house, 14 by 27 feet, with an addition 14 by 14 feet, and a 7 by 14 porch. There is a barn 24 by 30 feet, a garage 12 by 18 feet, a chicken house, and other sheds and outbuildings.
Jet aircraft pass directly over this tract at elevations of less than 500 feet. It was plaintiffs’ testimony that the jet planes are as low as 300 to 350 feet when passing over this property. Most of the planes pass over the land close to the house, approximately 150 to 200 yards to the east. The jet planes render conversation impossible, the windows rattle, and television reception is interrupted. Mrs. McAdams is often awakened at night, and becomes nervous from the low flights of the large jets. She counted 21 planes passing over one morning in a short period of time.
Tract No. 9: Plaintiff Troy O. Phillips (35) owns this 120-acre tract, described as East Half of Northwest Quarter and West Half of West Half of Northeast Quarter, Section 27, Township 11 North, Range 19 West. This tract is subject to a mortgage to Travelers Insurance Company. Plam- *631 tiff acquired, the laud in 1945, and lived there until April 1961 when his wife died. Since that time the land has been farmed by a neighbor and the house rented.
The land is all gently rolling and tillable, sandy loam soil, without waste, adaptable for cotton, wheat, and grain crops. Cotton allotment is 40 acres, and wheat allotment is 15 acres.
Improvements consist of a very good, modern, six-room frame house, 26 by 36 feet, with basement; a barn 24 by 28 feet, a shop and granary 12 by 24 feet, a garage, smokehouse, chicken house, and other sheds and structures adaptable to general farming use.
The house is located almost in direct line with the runway to the north and jet aircraft pass overhead, both on take-off and landing. Plaintiff’s proposed finding estimates the height of such planes as “approximately 500 feet above ground,” but there is no direct personal testimony of plaintiff to that effect. The jets turn to the right or left almost over the house, and on take-off they are still climbing as they pass overhead. The record does not contain adequate proof to support a finding that the planes pass over this property at elevations of less than 500 feet. The place is rented to a man who farms the land. The house is occupied by a school teacher. Plaintiff testified that he has had no difficulty in getting someone to work the land. He offered no testimony about complaints by present tenants with respect to noise of planes, but stated that he and his wife were bothered by the noise when they lived on the property.
Tract No. 10: Plaintiff Louie A. Whittenburg (48) is the owner of this 120-acre tract, described as East Half .of Northeast Quarter and East Half of West Half of the Northeast Quarter of Section 27, Township 11 North, Range 19 West. This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas.
The land is gently rolling sandy loam, all tillable except approximately 25 acres in native grass and seeded pasture. It is adaptable for growing cotton and grain crops and raising livestock. Cotton allotment is 39 acres.
Plaintiff has owned the property since 1924, and has lived on it since 1930. Improvements consist of a very good six-room modern home of asbestos shingle construction, 18 by *632 26 feet, with an addition 20 by 12 feet; a barn 36 by 50 feet, a garage 22 by 22 feet, a chicken house, storm cellar, and other sheds and structures adapted to farming operations.
The record contains testimony by plaintiff, not rebutted, that jet aircraft from the Base fly over this tract and over the improvements, both during the day and at night, at altitudes of from 400 to 500 feet above the ground, sometimes higher, sometimes lower. Overflights are more frequent on take-off than on landing, especially when the wind is in the northeast, at which time the aircraft drift eastward into the wind. There are times when the jet aircraft pass over the property in rapid succession. Both bombers and tankers are still climbing as they reach this tract. The tankers tend to level off over the southern portion of this tract and resume the climb farther north.
Tract No. 11: This tract of 80 acres is owned by plaintiff C. C. Dugger (2), and is described as West Half of Northwest Quarter, Section 27, Township 11 North, Range 19 West.
This land is farmed by the owner’s son, and a house on the tract is rented. The soil is a fine sandy loam, unusually productive for cotton, since it is sub-irrigated by water seeping below the surface.
Improvements consist of a one-and-one-half-story frame dwelling 16 by 22 feet, with an addition 14 by 21 feet, and a porch 8 by 21 feet. There is a barn 19 by 28 feet, a cellar 10 by 12 feet, a chicken house 12 by 24 feet, a cow shed 12 by 24 feet, and other sheds and structures for farm use.
The tenant is living in the house only until he can complete his own home, but he testified that he would not live there permanently. Plaintiff testified that the family is awakened by night flights and the small child is frightened by the multijet airplanes. The proof is not adequate to establish that aircraft pass over the house both in the daytime and at night at elevations of less than 500 feet above the ground.
Tract No. 12: Plaintiff Noah O. Phillips (34) is the owner of this 80-acre tract, described as East Half of Northeast Quarter of Section 28, Township 11 North, Range 19 West. *633 This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas.
This is an unimproved tract, very level and tillable sandy loam soil, without any wasteland. It has a cotton allotment which has been transferred to other land by the owner, and the tract has been devoted to raising small grains.
At times jet aircraft from the Base fly directly over this tract. Plaintiff testified that they “drown out” the noise of a farm tractor as they fly over, but his testimony as to elevation of the planes when they pass over was inconclusive and unimpressive. It is found that the record fails to establish any diminution of market value as a result of the flight of aircraft to and from the Base.
Tract No. 13: This tract, consisting of two parcels, 93.79 acres, is owned by plaintiffs Donald D. Johnson (20) and Joyce Johnson (22), and is described as North Half of Southeast Quarter of Section 34, and West 13.79 acres of Southwest Quarter of Southwest Quarter of Section 22, Township 10 North, Range 19 West. This tract is subject to a mortgage to Prudential Insurance Company of America. The 80-acre tract is south of the south end of the runway, while the 13.79-acre tract is adjacent to and about 300 to 400 feet west of the south end of the runway. Plaintiffs have lived there since 1956, and now have a three-year-old daughter.
The soil of the 80-acre tract is a dark sandy loam surface, with a sandy clay subsoil, which holds moisture exceptionally well. It is as fertile as any land in the entire area. It is irrigated by a four-well chain system with underground pipelines. The farm has a 44-acre cotton allotment, and a 15-acre wheat allotment. It has been producing one and a half to two bales of cotton per acre. The cotton allotment is concentrated in the irrigated 80-acre tract, and wheat and maize also are being raised.
The improvements are very good and in splendid condition. They include a large five-room house, 26 by 30 feet, with an addition 10 by 26 feet and basement; a barn 43 by 45 feet, a machine shed and granary 18 by 32 feet, a feed mill 80 by 20 feet, an open cattle shed 100 by 12 feet, a brooder house and chicken house, and other sheds and structures suitable for
*634 the farming operations. The improvements are located on the east side of the 80-acre tract.
The large jet aircraft do not regularly pass directly over the house. They usually pass over the western portion of the 80-acre tract. About 10 to 20 percent of the flights actually pass over the improvements, for the most part from take-off at the Base. The aircraft fly over the 13.79-acre tract primarily on low approaches, flying alongside the runway to the west.
Plaintiffs suffer disturbance in their house from the noise and vibration as the planes pass over the western portion of the tract. The young girl is frightened, and the family is awakened late at night by the noise.
Plaintiff estimated that the jets pass over the 80-acre tract at an average altitude of 300 feet, and are as low as 150 feet over the 13.79-acre tract.
Tract No. 1J¡.: Plaintiff Eddie Walters (44) owns this 80-acre tract, described as North Half of Southeast Quarter of Section 22, Township 10 North, Range 19 West. Plaintiff has lived on the property, with his wife and two sons, since 1953.
The land is level, and all in cultivation. The soil is fertile, sandy loam, good for raising cotton. Cotton allotment is 39 acres.
Improvements consist of a modern five-room frame house, 24 by 30 feet, with porch 8 by 10 feet, in good condition; a barn 22 by 12 feet, a granary 10 by 16 feet, a hen house 16 by 24 feet, a brooder house 10 by 12 feet, and other sheds and structures used in farming operations. The improvements are located on the east side of the tract.
Jet aircraft do not regularly pass over the property on take-off and landing, but on other occasions pass over the land, and occasionally the house, at elevations which plaintiff Walters estimated at 450 feet above the ground. His words on direct examination were: “Well, my guess would be 450 feet, maybe.” Walters stated that planes do not go over the property when landing or taking off. Plaintiffs are disturbed to some extent by multijet aircraft passing over their land between the house and the runway. At such times conversation is very difficult for brief periods. Plaintiffs are also *635 awakened sometimes at night by such flights. The proof does not warrant a finding that planes fly over any of this property at elevations below 500 feet.
Tract No. 15: Plaintiffs Frank H. Greteman (8) and Dora Greteman (6) own this 80-acre tract, described as South Half of Southeast Quarter of Section 22, Township 10 North, Range 19 West. This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas. Plaintiffs and their two sons have lived on the property since 1950.
The land is level and all tillable. The soil is a fine sandy -loam, and very fertile. Plaintiffs grow cotton and feed grains on the land. The cotton allotment is 36.4 acres.
Improvements consist of a modem six-room frame house in very good condition, 24 by 40 feet, with basement and porch 8 by 14 feet; one barn 26 by 22 feet, another barn 24 by 30 feet, a hen house, brooder house, and other sheds and structures used in farming operations. This is the headquarters for farming two additional tracts in the vicinity. The improvements are located on the west portion of the tract, along the south boundary, about a quarter mile directly east of the south end of the runway.
The jet bombers and tankers pass over the property and over the residence at heights of less than 500 feet above the ground, as often as three or four times a day. These low flights are primarily low approaches, rather than actual landings. The flights occur both in the daytime and at night, and cause disturbance and loss of sleep to the- occupants.- The house vibrates and conversation is impossible for brief periods. '
Tract No.-16: Claim withdrawn by plaintiffs Clyde B. Price (36) and William N. Price (37).
Tract No. 17: This tract contains approximately 44.51 acres, and is owned by plaintiff Robert E. Davis (1). It is described as Northwest Quarter of Northwest Quarter, and North Half of Southwest Quarter of Northwest Quarter of Section 27, Township 10 North, Range 19 West, 60 acres less 15.49 acres previously acquired by the defendant.
The land is good fertile sandy loam soil, being devoted to raising wheat. Some nine acres are in pasture and sand pit. Except for two old storage sheds, the property is unimproved.
*636 This tract is directly in line with the south end of the runway, and immediately beyond the south boundary of the field. All aircraft taking off and landing pass directly over this property, and the large jets fly over it at altitudes of about 75 feet above the ground. The noise is so great as to cause plaintiff to stop and cover his ears if a plane passes over while he is cultivating. The land now has no utility except as crop land. It is virtually unsaleable.
Tract No. 18: Plaintiffs Charles J. Higginbotham (16) and Jennie P. Higginbotham (17) are owners of this 56.90-acre tract, described as East Half of Northwest Quarter of Section 27, Township 10 North, Range 19 West, 80 acres less 23.10 acres previously acquired by defendant. This tract lies directly south of the south end of the runway. Plaintiffs acquired the land in 1945.
The land is level and all in cultivation. The soil is a fertile, sandy loam. The tract formerly was improved but the residence was removed at the time the defendant acquired part of the tract in fee and clearance easements over the remainder.
Clearance easements previously obtained by defendant extend from 10 feet on the north end to 50 feet on the south. Jet aircraft pass over this tract at extremely low altitudes. The tract has no present utility, except for raising crops. It has no present value for residential occupancy.
Tract No. 19: Plaintiff E. E. Smith (43) was the owner of this 140-acre tract, described as South Half of Southwest Quarter of Northwest Quarter; North Half of Southwest Quarter; and Southwest Quarter of Southwest Quarter of Section 27, Township 10 North, Range 19 West. Plaintiff was the owner of this tract until his death shortly before trial of this action. Thereafter his widow, Pearl Smith (not a plaintiff), became sole owner thereof. The couple had owned the property for 45 years and had lived on it 42 years. Formerly they farmed the land, which is now worked by a tenant.
The soil is a fertile sandy loam, suitable for the cotton and other crops being grown on it. All but about 28 acres are in cultivation.
*637 Improvements consist of a large nine-room bouse, 42 by 21 feet, with additions 13 by 21 feet and 8 by 14 feet, and a porch 7 by 38 feet. The family made this their permanent home for 42 years. Other improvements include a barn 40 by 28 feet, a cellar and smokehouse 10 by 13 feet, a poultry house 38 by 10 feet, and other sheds and structures adapted for use in a diversified farming operation.
The improvements are directly in the approach zone, slightly west of the extended center line of the runway. The jet aircraft pass directly over the house, on take-off and landing, at very low altitudes. The noise has been nerve-racking, and the entire house vibrates. The family was often awakened at night, and lived in constant fear of aircraft crashes. They moved to Dill City because the disturbance was too great for them to endure. They testified that they had intended to remain there the rest of their lives. Thereafter it has been difficult to rent the property, and it has been empty more than half the time. A farm tenant formerly lived in the house, but moved out for the same reason which caused the owners to leave. At the time of trial a family was being permitted to occupy the home rent free, to look after it and keep it occupied. The disturbance from flights of jet aircraft has rendered this property unfit for occupancy as a home, and greatly reduced its prior market value as a farm.
Tract No. W: Plaintiff Ella B. Hoover (19) is the owner of this 160-acre tract, described as Southeast Quarter of Southwest Quarter of Section 27; North Half of Northwest Quarter; and Southeast Quarter of Northwest Quarter of Section 34, Township 10 North, Range 19 West. This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas. Plaintiff has owned the land since 1924. Since 1949 it has been farmed by a tenant who formerly lived on the property with his family but moved off because of low-flying aircraft.
The land is gently rolling, and the soil is sandy loam. All of the tract is tillable, and all but 20 acres currently is in cultivation. It is good cotton land, and bears a cotton allotment of 62 acres. It is well suited to wheat and grain crops also grown there.
*638 The improvements consist of a four-room house, covered with asbestos shingles, 18 by 30 feet, with two porches. There is a barn 32 by 22 feet, a garage 18 by 20 feet, a storage house, hen house, and other sheds and structures. The house has been vacant since the tenant moved out in 1961.
The residence is almost directly in line with the runway and about one mile south of the south end of the runway. Flights of jet aircraft taking off from and landing at the Base pass directly over the property, and directly over the house, in the daytime and at night. Jet flights average eight to ten a day. Aircraft engaged in practice landings and low approaches also pass over the house. Multi jet aircraft regularly fly over the property at elevations of approximately 200 to 250 feet above the ground. The noise, vibration, and disturbance from frequent flights of jet aircraft at low altitudes, together with fear of an aircraft crash, has rendered the residence on the property substantially uninhabitable.
Tract No. 21: Plaintiffs Bertha Rogers (42), Juanita Nagel (31), and Wanda Riggins (41) are joint owners of this 240-acre tract, described as Southeast Quarter of Section 27 and West Half of Northeast Quarter of Section 34, Township 10 North, Range 19 West. Mrs. Rogers is the sole owner of the 80-acre tract, while the balance is owned in equal shares of one-third each. All of the land has been owned by the Rogers family for 25 years, and part for 35 years. The tract is all tillable level upland, composed of a fine sandy loam soil. About 25 acres is idle, and the rest in cultivation. The cotton allotment is 102 acres.
Improvements include a six-room frame house, 24 by 32 feet, with a porch 8 by 19 feet, a bam 20 by 24 feet, a poultry house 16 by 35 feet, a brooder house 10 by 20 feet, a cellar, a utility house, and other sheds and structures adapted to farm use. The improvements are in the southwest comer of the property, inside the approach zone for jet aircraft using the runway. Both in taking off and landing, the jet airplanes pass over -the house at elevations of less than 500 feet above the ground. The house has been rented, but is now vacant. The noise is very disagreeable, and the house and windows shake considerably. It has been difficult to *639 rent, with three different families having moved in and out within a period of twelve months since the aircraft started flying over the property.
There would be a good market for a farm of this type, except for low flights of aircraft. Its utility for occupancy as a residence is substantially destroyed, unless improvements were moved or built on another location away from the runway.
Tract No. ££: Plaintiff Gr. J. Wallis (47) owns this 80-acre tract, described as South Half of Northeast Quarter of Section 27, Township 10 North, Eange 19 West.
Plaintiff has owned and occupied this property for 31 years. The land is level and all tillable; and is composed of sandy loam soil. It is very productive for cotton and feed crops. The cotton allotment is 34 acres.
Improvements consist of a modern six-room frame house in good condition, a store room, a two-car garage 12 by 20 feet, an implement shed 18 by 24 feet, a cellar, and other sheds and structures suitable for use in farming operations.
The aircraft fly over the tract both in daytime and at night at elevations of 500 feet or less. The four-motor propeller planes fly over more often than jets. The aircraft do not pass over the house itself very often, but pass over the tract somewhat west of the house. The improvements are on the east edge of the land. The noise is very loud and disturbing when the aircraft go by slightly to the west, but not as bad as it is when they pass directly over the house.
Tract No. £3: Plaintiffs Bernard M. Kilhoffer (24) and Donna J. Kilhoffer (25.) own this 80-acre tract, described as East Half of Southwest Quarter of Section 34, Township ION orth, Eange 19 W est. This tract is subj ect to a mortgage to Federal Land Bank of Wichita, Kansas.
Plaintiffs have occupied this property since 1956 with their five children. They farm other land adjoining on the east.
The land is level, fertile, dark, sandy loam soil. It is very suitable for growing cotton, wheat, and grains. The cotton allotment is 42 acres, and production has averaged a bale to the acre, without irrigation.
*640 At the time of taking, improvements consisted of a six-room frame house, 24 by 26 feet, in good condition; a dairy barn 36 by 30 feet, built to Grade A specifications; a milking shed, a storage shed; and other structures used in plaintiffs, farming and dairy operations. There is also a 100-foot well, fitted with five-inch casing, adaptable for irrigation.
A new house was built in 1960 after the taking of a flight easement. Plaintiffs now occupy the new house and rent the old residence. Value of the new home was excluded in all appraisals made with respect to diminution of market value.
The improvements are at the south side of the tract, slightly east of the extended center line of the runway. The large jet aircraft pass directly over the tract and over the improvements in landing and in taking off from the Base, in daytime and. at night. Flights of such jets will average about six per day. Sometimes the aircraft follow each other in rapid succession, in groups of three planes. Night flights occur several nights per week, and continue until late hours.
The noise of the jet aircraft is nerve-racking, and especially frightening to Mrs. Kilhoffer and the children, since it often sounds like an approaching tornado. Conversation is precluded as the aircraft pass over, and the family is often awakened by the jet planes. Jet aircraft pass over this tract at an elevation of less than 500 feet above the ground.
Tract No. : Mrs. I. M. Johnson (21) owns this 80-acre tract, described as South Half of Southeast Quarter, Section 34, Township 10 North, Range 19 West. It is farmed half by her son, Donald Johnson, and half by her son-in-law, Bernard Kilhoffer, each of whom own adjoining land.
The soil is a dark, sandy loam, with sandy clay subsoil, and is as fertile as any land in the entire area.
Improvements consist of a five-room house in good condition, 24 by 36 feet, with basement and porch, garage 34 by 16 feet, shop 22 by 16 feet, bam 36 by 24 feet, granary 10 by SO feet, poultry house 16 by 14 feet, storage shed, grain bin, and other structures adapted for use in connection with farming operations. The improvements are located in from the south side of the tract, about midway between the east and west boundaries.
*641 Mrs. Johnson lives alone on the property. The jet aircraft pass over this tract, and over the residence located on it, at elevations of less than 500 feet. The noise and disturbance at the residence located on this tract are substantially the same as at other locations where the jet planes pass over the house or over the land in the vicinity of the improvements.
Tract No. %5: Plaintiff John S. Prickett (40) owns this tract of 79.5 acres, described as East Half of Northwest Quarter of Section 3, Township 9 North, Range 19 West, 80 acres less a y2 acre tract previously conveyed to Frank Prickett. This tract is subject to a mortgage to Commissioners of the Land Office of the State of Oklahoma. Plaintiff owned this land from 1918 until after the taking, when all but five acres, containing the improvements, was conveyed to his youngest son. Plaintiff and his wife raised a family of ten children on the property, and testified that they have intended to continue to make their home there.
The tract is level and all tillable, the soil is a sandy loam, and is very productive for the crops grown in the area, including cotton and feed.
The improvements include a four-room frame house 14 by 30 feet, with addition 14 by 14 feet, a garage and storage building 20 by 52 feet, a cellar, pump house, hen house, and other structures.
This tract is located directly south of the south edge of the Base, and the improvements are almost directly in line with the extended center line of the runway, on the north side of the tract. The large jet aircraft fly directly over the land and over the house, which is just across the road from the house on the Kilhoffer property, Tract No. 23. The airplanes pass overhead on take-off and landing, at elevations under 500 feet. When the wind is out of the south, the multi jet bombers and tankers take off and land at a low altitude directly over the house.
The noise and vibration caused by the jet aircraft passing overhead at low altitudes is disturbing to occupants of the property, prevents conversation, and frequently keeps them awake at night.
*642 Tract No. 26: Plaintiffs Harold Evans (3), Mary J. Evans (4), bis mother, and Thelma Evans (5), his sister-in-law, each own an undivided one-third interest in this 80-acre tract, described as North Plalf of Northeast Quarter of Section 3, Township 9 North, Range 19 West. It is farmed by Harold Evans, who lives on an adjoining farm, but maintains his shop, equipment, and farming headquarters there. Mary J. Evans and Thelma Evans live in the residence on the tract. Mary J. Evans has lived there since 1917, and Thelma Evans since 1926.
The tract fronts on a paved highway, and is level, without wasteland. The soil is very fertile, a dark, sandy loam, exceptionally suited for growing cotton. Crops raised include 36 acres of cotton and the balance in wheat and barley.
Improvements consist of a modern, five-room house in good condition, 24 by 36 feet, with cellar and addition 7 by 14 feet; a large shop 18 by 30 feet; a two-car garage 18 by 20 feet; a frame storage building 10 by 12 feet; a grain bin; granary; hen house; calf shed; and other structures suitable for farming operations on this and other land.
The tract lies about two and a quarter miles south of the south end of the runway, and slightly east of its extended center line. The improvements lie along the north side of the tract, somewhat west of the center thereof. Jet aircraft pass over the land and the house, both in taking off from and landing at the Base, at altitudes below 500 feet, estimated by plaintiff at 350 feet or lower. The planes customarily pass over the house, or over the property slightly west of the house. They also fly over at low altitudes on practice landing and minimum-interval take-off maneuvers.
When jet aircraft pass over the house at these altitudes they create much noise and are very disturbing. Conversation is interrupted, the house vibrates, and at night occupants of the house are awakened. Harold Evans testified that the owners intended to build a new home on the premises but in view of the flight of aircraft over the property they have not done so.
Tract No. 27: Plaintiff B. P. Prickett (38) owns this 40-acre tract, described as Southwest Quarter of Northwest Quarter of Section 3, Township 9 North, Range 19 West. *643 This tract is subject to a mortgage to the Commissioners of the Land Office of the State of Oklahoma.
The tract is unimproved, and is suitable for growing cotton and feed crops. The land is level, and the soil is a fertile sandy loam.
The tract is directly in line with the extended center line of the runway, and adjoins the land of John Prickett, Tract No. 25, on the west. The meager record concerning this claim does not warrant a finding that aircraft using the Base pass over the tract at altitudes less than 500 feet above the ground.
Tract No. 28: This tract consists of a half acre residential lot, carved out of Tract No. 25 (B. P. Prickett), and is part of the East Half of Northwest Quarter of Section 3, Township 9 North, Range 19 West. It is owned by plaintiff Frank Prickett (39), subject to mortgages to Dill State Bank and B. P. Prickett.
There is a home on this tract, occupied by the owner. It is a modern, five-room ranch style house, with an attached one-car garage, in very good condition, constructed in 1956. The dimensions of the house are 22 by 26 feet, with addition 20 by 24 feet, and the garage is 12 by 24 feet. A shop and storage shed 16 by 13 feet is located on the land.
Plaintiff lives there with his wife and son, a daughter being away at college. The house is located south of the runway and slightly east of its extended center line. Some planes pass over the house in the daytime and at night, while taking off from and landing at the Base, at elevations less than 500 feet.
Plaintiff and his family are disturbed to some extent by the noise and vibration from the planes passing overhead, and are also awakened at night. Plaintiff testified that he would not have built his home in this location if he had known in 1956 that it would later become subject to overflights of large jet aircraft at low altitudes.
Tract No. 29: Plaintiffs Edward Greteman (7) and Jocie Martha Greteman (9) own this 80-acre tract, described as East Half of Southeast Quarter of Section 33, Township 10 North, Range 19 West. This tract is subject to a mortgage to Federal Land Bank of Wichita, Kansas.
*644 Plaintiffs have lived on this property since 1937, and have owned it since 1954. The present family consists of the plaintiffs and their two boys. Plaintiffs farm this tract and other land in the vicinity.
The land is rolling to level, with a slight ridge through it. The soil is a reddish brown, suitable for raising cotton and small grains. Cotton allotment is 36.6 acres.
Improvements consist of a seven-room modern house of stucco and frame construction 43 by 25 feet, with porch 18 by 8 feet. An old house 26 by 14 feet is used for grain storage, and there is another granary 16 by 16 feet. There is a garage, cellar, hen house, tile pump house, and other structures used in the farming operations.
The improvements are located adjacent to the road running along the east side of the tract, just south of the northern boundary, and within the approach zone at the south end of the runway. Jet aircraft pass over this land and the residence on it while taking off from the Base. Practice landing operations in particular cause the large jets to pass over this tract as they circle for repeated simulated take-off from the field. One plaintiff counted 14 overflights by multi jets in a short period one evening. The altitude at which jets pass over this tract is less than 500 feet.
The noise and vibration from the jets going over at low altitudes is very disturbing. Conversation is rendered impossible and the use of telephone and television is interrupted for a brief period, when a plane approaches and goes over. The flights occur at night, and the family is often awakened by the noise and bright landing lights of the j et aircraft. The vibration causes windows to rattle, and the stucco on the house has begun to crack.
Tract No. SO: Plaintiff Johnnie Leo Walters (46) owns this 80-acre tract, described as East Half of Northeast Quarter of Section 33, Township 10 North, Range 19 West. This tract is subject to a mortgage to Cleo W. Walters.
Plaintiff has lived on this tract since 1945 with his wife and three sons.
The land is level, and all sandy loam, except a small wet spot in the south portion. There is an irrigation system on the property, consisting of two wells 165 feet deep. Two *645 pumps provide 200 gallons of water a minute from the wells, which, through a series of two-and-one-half-inch pipes, and overhead sprinklers, are capable of irrigating 40 acres of cotton. The cotton allotment is 41 acres, and plaintiff has averaged from one and a quarter to one and a half bales of cotton per acre. He also raises maize and 15 acres of wheat.
Improvements consist of a modern three-bedroom frame home, in good condition, and remodeled and modernized in approximately 1958. The house is 16 by 38 feet, with addition 16 by 28 feet, and there are some additional sheds and structures used in the farming operations.
The home is located in the extreme northeast comer of the tract, at the point nearest the runway and just outside the clearance easement area. When the wind is from the southwest, the large jet aircraft pass directly over the house, taking off from the Base. On practice landings and low approaches, the jets bank to the west almost directly over the house in circling for repeated approaches to the field. Flights over the property occur on the average four days a week, at altitudes of less than 500 feet above the ground.
The noise of jet aircraft passing over the residence, or over the property near the residence, is very disturbing to the occupants. Conversation is impossible for approximately one minute as each plane approaches and passes over. Plaintiff and his family are often awakened at night, and the vibration causes windows to rattle. This condition still obtains after the recent remodeling.
Tracts Nos. 31 and 32: These tracts, totaling 160 acres, are owned by plaintiffs Allen Guthrie (10) and Dora Guthrie (12), and are described as: Northwest Quarter of Section 10, Township 9 North, Range 19 West. These tracts are subject to a mortgage to Federal Land Bank of Wichita, Kansas. Plaintiffs have owned Tract No. 31 since 1947, and acquired Tract No. 32 (prior to the taking by the defendant) in 1958 from plaintiff J. M. Guthrie (14).
The tracts are farmed as a unit by plaintiffs, who live on the property with their four children.
The soil is fine sandy loam, suitable for raising cotton and small grains. The cotton allotment is 60.2 acres.
*646 Improvements consist of a five-room frame house, 26 by 32 feet, with porch; a bam and granary 22 by 38 feet; a garage; hen house; cellar; pump house; brooder house; and other sheds and structures utilized in the farming operations.
Multijet aircraft pass over the property an average of 8 to 10 times a day in taking off from and landing at the Base. The large jets regularly pass over at altitudes less than 500 feet above the ground. The improvements are located along the north side of the 160-acre tracts, almost directly in line with the extension of the runway. Flights occur over the property an average of two or three nights per week, and plaintiffs are awakened by the jets passing over at various times during the night. The disturbance is similar to that suffered by owners of other tracts under the approach pattern followed to the runway.
Tract No. 33: Plaintiff Henry Walters (45) owns this 347.45-acre tract, described as West 27.45 acres of Northwest Quarter of Section 22, and South Half of Section 21, Township 10 North, Range 19 West. This tract is subject to a mortgage to the Commissioners of the Land Office of the State of Oklahoma.
Plaintiff has lived in his present home near the center of the property since 1955, with his wife and two sons. Prior to that time he lived in another home on the, east side of the same tract adjacent to the runway.
The east half of the tract is very level, while the western portion is slightly rolling. All of the land is good sandy loam soil, and the entire tract is tillable and in cultivation. The farm is very productive, and has a cotton allotment of 123 acres.
There are two sets of farm buildings on the premises. On the east side of the tract is a six-room frame house 29 by 24 feet, with an addition 10 by 29 feet and porch 10 by 14 feet; a cellar; chicken house; garage; implement shed; bam; and other sheds and structures.
Near the center of the tract, on the south boundary, is the owner’s residence, a very good brick home; and also a large, old-fashioned hay bam 30 by 36 feet, with loft overhead; and a metal bam built after the taking and not considered in the valuations made here. This farm would be very saleable if *647 it were not for proximity to the Air Base and flights of jet aircraft over it at low altitude.
The large jet tankers and bombers fly over the land and over both houses at altitudes of from 200 to 400 feet above the ground. They pass over the owner’s home when they approach the runway from the south, and do not land, but turn off to the left. They also go over when they make low approaches from the north, and turn west before they reach the end of the runway. Occupants of this tract are disturbed and also awakened at night by the noise of the jets in a manner similar to the experience of other owners of tracts in the vicinity of the Base.
2. Clinton-Sherman Air Force Base was originally established as a Naval Air Training Station, and was deactivated at the end of World War II. The Base was reactivated in 1956 and 1957, and the single north-south runway was lengthened to 13,502 feet between August 1956 and J anuary 1958. Since reactivation, it has been operated as an installation of the Strategic Air Command and a base for heavy, long range, tactical jet aircraft. Units assigned to the Base include the 98th Bomber Squadron (B-52), the 902nd Air Refueling Squadron (KC-135), and various supporting units.
The first flights of jet aircraft from the Clinton-Sherman Base occurred between August and November 1958, when the B-52 and KC-135 aircraft assigned to Altus Air Force Base used the Clinton-Sherman Air Force Base while the runways at Altus were being reconstructed. Thereafter, the 98th Bomber Squadron was assigned to Clinton-Sherman Air Force Base, and from about the middle of the year 1959 there have been an average of approximately 15 B-52 multijet bombers, and 10 KC-135 multijet fuel tankers assigned to that Base and flying from it. During 1958 and 1959, jet traffic was light, ranging from about four flights per month (considering one take-off and one landing to constitute a flight) to about 50 flights per month. Around the first of the year 1960 the flights increased to approximately 300 per month, or about 10 per day. The average for the year 1960 was approximately 275 flights per month; and the incomplete figures for 1961 indicate similar averages. Total traffic, including jet and nonjet operations, ranged between *648 1,178 and 2,362 operations per month (considering each take-off and landing as one operation, and each practice low approach as two operations); with an average of 1,735 per month, or approximately 58 operations per day.
3. Clinton-Sherman Air Force Base has a single north-south concrete runway 13,502 feet long. At each end is a paved over-run extension 1,000 feet long. The runway is 300 feet wide. At each end of the runway there is.a rectangular clear zone 1,000 feet long and 1,500 feet wide. Part of the clear zone is a paved over-run in direct extension of the concrete runway. It is a safety area, not intended for use by aircraft.
Superimposed at each end of what can be termed the approach zone is a clearance easement area, fan-shaped, where the defendant has acquired the right to raze and remove structures extending above the glide angle plane. The clearance easement extends outward for a distance of 5,000 feet from the end of the clear zone, at which point it is approximately 3,250 feet wide.
All or part of Tracts Nos. 1 (Merz), 2 (Kerkhoff), 3 (Guthrie), 17 (Davis), 18 (Higginbotham), 19 (Smith), 20 (Hoover), and 21 (Rogers, et al.), lie within the clearance easement area. The United States has acquired clearance easements upon lands located in the clearance easement area in condemnation proceedings. Awards of just compensation for the interests taken were made in U.S. District Court. At the time of trial, the cause was pending in the U.S. Court of Appeals for the Tenth Circuit, on an appeal taken by the United States challenging the amount of compensation awarded. Subsequently the Court of Appeals affirmed the findings of the District Court with respect to such awards.
The clearance easements previously acquired by the United States gave it the right to limit the height of structures or vegetation extending above the glide angle plane. Such easements did not confer upon defendant the right to fly aircraft at low altitudes over the land.
4. The various tracts of land involved in this action lie in the vicinity of the north and south ends of the runway at Clinton-Sherman Air Force Base. For the most part, they lie in the approach zone, at or near the extended center line *649 of the runway. Tbe table below shows the approximate position of each of the tracts in relation to the runway. Distances from the end of the runway, and laterally from the projected center line of the runway, are to the nearest corner of each tract; all distances are approximate:

5. Within the approach zone at each end of the runway is a minium safe glide angle to be observed by aircraft. The angle begins at ground level at the outer edge of the clear zone, 1,000 feet beyond the end of the concrete runway, and rises at a 1: 50 ratio (one foot vertically for every 50 feet horizontally) to a height of 200 feet above the runway elevation. The approach surface is a horizontal plane within the approach zone, beginning at ground level at the outer end of the clear zone, thence extending upward and outward along the glide angle to a point 200 feet above runway elevation, which is reached at a point 10,000 feet from its beginning. Thereafter the approach surface continues horizontally, parallel to the ground, 200 feet above runway elevation.
The glide angle establishes a clearance criterion, above which all structures and vegetation will be removed.
*650 6. The Base is equipped with ground control approach (GCA) equipment, a radar system for landing aircraft by instructions given by radio from the ground. GCA is used to land aircraft under conditions of poor visibility. Approximately 35 percent of all aircraft landings, and 90 to 95 percent of all landings by B-52 and KC-135 aircraft are under GCA supervision. The flight path established for aircraft landing under GCA direction commences at a touchdown point on the concrete runway 750 feet from the end thereof, and extends upward over the projected center line of the runway at an angle of 2.5 degrees. The contour of the land affects the actual elevation of this line above the ground at any particular point. The ground slopes gradually downward moving north from the Base along the extended center line of the runway. There is very little difference in the elevation moving south from the Base.
7. Below the GCA flight path is another imaginary line designated the lower safety limit for GCA landings. This line begins at ground level at the end of the runway, extending upward along its extended center line at an angle of 2 degrees, to a height of 1,600 feet, where it continues parallel to the ground. The lower safety limit is 85 feet below the GCA flight path at one nautical mile out (6,080 feet), 138 feet below it at two nautical miles out, and 297 feet below it five miles out.
The GCA equipment consists of two radar scopes, one for tracking aircraft at longer distances, and another precision insti’ument to follow the location of the aircraft upon direct approach for landing. The approaching airplane appears as a line on a radar screen, upon which the GCA flight path and the lower safety limit are electronically projected. As the aircraft approaches, the pilot is given oral instructions by radio as to his direction with respect to the runway and his altitude with respect to the GCA flight path. When the aircraft is below the GCA flight path but above the lower safety limit, the pilot is so informed, to enable him to correct his angle of approach. The pilot is not absolutely required to follow the directions of the GCA operator. When an aircraft approaching for landing encroaches upon the lower safety limit, it is directed to execute a missed approach — to *651 climb to 4,000 feet, and circle for another attempt. It is not possible to measure the amount of deviation in feet from the GCA flight path at any given time with any degree of accuracy. The scope accurately depicts the aircraft in relation to the GCA flight path, but interpretation of distances is all relative. When the aircraft has descended to 300 feet or reached a point one mile from the end of the runway, the GCA continues to report its location, and deviation from the GCA flight path, but the pilot controls the final landing approach.
The Base also is equipped with Instrument Landing System (ILS) at the south end of the runway only. The device transmits electronic signals designed to guide the pilot to the GCA flight path, and to inform him of any deviation from it. An instrument in the cockpit depicts deviation from the runway and from the GCA flight path. It is designed to inform the pilot of his position, and exercises no control over pilot action.
8. The elevations of the glide angle (approach surface), GCA flight path, and GCA lower safety limit, at the point nearest the runway, as to each tract, are set out below.[11]
Tract No. Elevation of glide angle (feet) (approach surface) Elevation of GOA flight path Elevation of lower safety limit Tract No. Elevation of glide angle (feet) (approach surface) Elevation of GCA flight path Elevation of lower safety limit
1_ 11 85 55 17. 11 86 65
2_ 65 185 120 18.. 11 86 65
3.. 65 185 120 19.... 37 127 76
4. 250 465 350 20. 84 214 140
5 (Part)., 6 (Part).. 250 307 465 652 350 600 21_ 22.. 60 23 155 107 90 66
250 465 350 23. 166 366 265
7_ 121 265 185 24. 192 412 295
8...*_ 292 587 440 25. 217 472 335
9. 317 717 550 26_ 217 472 335
10. 317 717 550 27.. 225 535 395
11.. 317 717 560 28. 218 475 336
12. 317 717 550 29. 166 366 255
13 (Part).. 0 0 0 30. 112 267 182
13 (Part).. 166 366 255 31 and 32. 237 717 520
14.. 0 0 0 0 0 0
15_ 0 0 0
*652 9. The principal jet aircraft assigned to Clinton-Sherman Air Force Base have been B-52 jet bombers and KC-135 jet refueling tankers. These aircraft are described as follows:
B-5%: An eight-jet, sweptwing, long-range, heavy-bomber, it is one of the largest tactical aircraft of the U.S. Air Force. Its dimensions and characteristics are:
Length, 157 feet, 7 inches.
Wingspan, 185 feet.
Height, 40 feet, 8 inches.
Loaded weight, 488,000 pounds.
Unloaded weight, 140,000 pounds.
Service ceiling, over 50,000 feet.
Range, 9,000 miles.
It is capable of speeds in excess of 650 miles per hour, and can be refueled in the air. Its eight Pratt & Whitney J-57-P-43-W turbojet engines are mounted in pairs in four nacelles, two on each side of the fuselage. Each jet engine is capable of 13,750 pounds of thrust.
KO-135: The Boeing Stratotanker is similar to the Boeing 707 commercial jet airliner, and is designed for high-altitude refueling of other jet aircraft, especially B-52 bombers. Dimensions and performance characteristics are:
Wingspan, 130 feet, 10 inches.
Length, 136 feet, 3 inches.
Height, 38 feet, 5 inches.
Loaded weight, 297,000 pounds.
Maximum speed, 642 miles per hour.
Service ceiling, 45,000 feet.
The KC-135 is equipped with four Pratt & Whitney J-57-P-31 turbojet engines, each capable of delivering 12,485 pounds of thrust.
Other aircraft, both jet and nonjet, use the Base. Transient aircraft and administrative aircraft take off and land frequently. From time to time, C-124 propeller-driven aircraft from Tinker Air Force Base, near Oklahoma City have utilized the facilities at Clinton-Sherman for practice touch- and-go landings and low approaches. The C-124 is a large, four-engine, non jet cargo aircraft. These aircraft utilize GCA on about 50 percent of the landings, the balance being visual landings and approaches.
*653 10. Considerable preparation precedes any mission of B-52 or KC-135 aircraft. The load to be carried and the weather, including wind, temperature, and barometric pressure, determine the amount of runway necessary for take-off. Jet engines are less efficient and require more runway when the temperature is higher, and at higher pressure altitude. At the average loaded weight, at 70 to 80 degrees temperature, the aircraft require approximately 9,000 to 9,500 feet of runway to leave the ground. Upon occasion, as much as 11,200 feet has been required. With the heavier loads, or under adverse weather conditions, the aircraft require more runway, and gain altitude more slowly after take-off. Both types of large jet aircraft use water injection to increase the efficiency of the jet engines on take-off.
Take-off is controlled by factors of time and speed. The aircraft must reach certain set speeds at specific time intervals after commencement of take-off roll. Procedure after take-off also is governed by attainment of specified speeds. Thus the height of aircraft over any particular point will vary with weather conditions and the speed attained in the particular take-off operation.
The KC-135 customarily climbs at take-off speed plus 10 knots to an elevation of approximately 500 feet. There, the aircraft is leveled off, to adjust flaps, secure landing gear, permit water injection to run out, and to accelerate to climbing speed. The aircraft continues level flight until a predetermined speed is reached, when further climb is commenced.
The B-52 climbs steadily, without leveling off. After reaching 1,000 feet, the aircraft adjusts flaps and increases air speed, while maintaining a slight rate of climb.
The bombers fly tactical missions of varying lengths, up to 24 hours in the air. Tankers fly missions to refuel bombers, lasting from 2 to 8 hours. Instruction in navigation, and in practice landings, normally occurs as the aircraft is returning from a mission. Aircraft depart and return from these missions either in the daytime or at night, as the mission requires. For tactical missions of the B-52 and regularly scheduled refueling missions of the KC-135, the aircraft is often fully loaded, but the majority of the *654 scheduled missions carry 250,000 pounds or less. Minimum-interval take-offs and other purely practice missions are flown with light load.
The normal pattern described by aircraft landing to the north commences at 20,000 feet above sea level at a point five miles south of the Base. The aircraft flies in a southwesterly direction some 18 miles, descending to 14,000 feet, and then turns to the left, flying in a northeasterly direction, while descending to 10,000 feet. Then the aircraft turns due north, and flies toward the Base, descending to 8,500 feet above sea level (approximately 1,600 feet above the ground). When it reaches a point six to seven miles from the end of the runway, it begins a gradual descent under GCA control. When landing to the south, the pattern is reversed, except the normal pattern is to the west of the Base.
Due to the human factor, wind direction, and other conditions, some deviations from elevation and direction, both on take-off and landing, are not uncommon. However, the pilots testified that, in taking off, they headed their planes in a manner to compensate for wind direction.
A maneuver frequently performed both by B-52 and KC-135 jet aircraft and by C-124 propeller-driven cargo aircraft is the “touch-and-go” practice landing or low approach. The aircraft approaches for landing in the normal manner, either under GCA direction or by visual approach. Upon landing, and while the aircraft is still rolling, power is reapplied, and the aircraft takes off. The aircraft circles to the west, re-enters the landing approach pattern, and repeats the maneuver. Aircraft practicing landings normally turn west one to three miles beyond the end of the runway to circle for subsequent practice approaches. At times, aircraft on low approach will turn west before reaching the end of the runway. On occasion, several of the large jet aircraft will be circling the field, practicing approaches or landings, and each plane will circle and approach the field several times. At those times, noise and disturbance from the jet aircraft is almost continuous. Such sessions of repeated practice landings and approaches by large jets occur two or three times a week.
*655 The low approach is identical, except that the aircraft never actually touches the runway, descending only to a point approximately 300 feet above the ground before reapplying power. When the Base was first reactivated, “touch-and-go” operations were conducted with B-52 and KC-135 aircraft, but they were discontinued in 1959 and such procedure now relates only to the C-124.
Another maneuver performed from time to time is the minimum-interval take-off, wherein three jet bombers or tankers take off at 15-second intervals, to train personnel in the technique of getting several aircraft airborne in a short time. In such case, in taking off to the south, one airplane proceeds straight ahead, another takes a course 10 degrees to the east, and the third 20 degrees to the east to avoid jet wash of the planes ahead.
Aircraft taking off from Clinton-Sherman Air Force Base regularly pass over some of the tracts involved in this action at varying altitudes. Upon landing, they pass over the same tracts in a descending course at similar altitudes. Other maneuvers, including low approaches, “touch-and-go” operations, minimum-interval take-offs, and varying approach and departure patterns cause the multijet aircraft to pass over some of the lands here involved at low altitudes. All aircraft take off and land into the wind, so that jet aircraft either take off over a particular tract or land over it.
In some instances, the normal flight pattern causes the aircraft regularly to pass over portions of a tract, but less frequently over the improvements. There is little difference in the intensity of noise and vibration of these large jet aircraft whether they pass directly overhead or slightly to one side. The aircraft are so large and the noise and vibration from the four or eight powerful jet engines is so deafening, that there is little difference in the amount of disturbance at the end of the runway itself and the disturbance farther out, when the planes are flying at low altitudes. The problem of noise is a relative one which is difficult to describe in specific language.
The low flights of extremely large and powerful multi jet bombers and fuel tankers over any of the tracts involved in this action has caused annoyance and inconvenience to the *656 respective plaintiffs, and to other occupants of homes located thereon. These are among the largest and most powerful j et aircraft now manufactured, and also the noisiest. The noise is terrifying, especially to children and persons who have not experienced it before. Each time such a plane approaches and passes, normal conversation is impossible for a period of approximately one minute. Telephone conversation is impossible and television reception is interrupted. Visitors are fearful of remaining in such close proximity to the aircraft operations. The buildings, and especially the homes, rattle and vibrate as these aircraft pass overhead.
Occupants of the tracts are also disturbed when these jet aircraft take off and land during the night. Take-offs and landings late at night and in the very early morning are not unusual. Repeated practice landings and low approaches sometimes continue until late at night.
The disturbance to peace and quiet experienced by plaintiffs and other occupants of these tracts from low-flying jet aircraft taking off from and landing at Clinton-Sherman Air Force Base, together with danger from possible aircraft crashes, has decreased the fair market value of some of the tracts involved in this suit. The value of tracts directly in line with the runway has been greatly reduced insofar as residential use and occupancy is concerned. Diminution in value of other tracts varies somewhat with distance from the end of the runway, and lateral distance from its extended center line. Individual consideration has been accorded each claim and a determination made concerning the diminution of fair mai’ket value, if any, which has occurred because of the taking of an easement of flight over all or a portion of each tract.
Expert witnesses were called by each party to testify as to the fair market value of each tract, and the decrease in its value, if any, caused by the taking of an easement for flight of aircraft.
Witnesses for plaintiffs were Charles D. Thomas, an experienced independent appraiser of Tulsa, Okla., specializing in appraisals of rural properties; and Rex Hoover, a banker and real estate dealer in the immediate area for 30 years. Defendant offered the testimony of Fred Lynde and Hugh *657 A. Aarant, both employees of the Corps of Engineers, U.S. Army, each of whom had appraised part of the tracts here involved.
A resumé of the testimony of witnesses for both parties with respect to the fair market value of each tract, and the difference in fair market value (subject to any existing clearance easements) is set out as follows:

*658

*659

11. Laud prices generally have increased in the area over a period of several years before and after the taking. The increase has equalled or exceeded the average increase in farm land values for the state. There was a steady increase for a period of several years before 1959. Prices leveled off temporarily in 1959 and 1960 and experienced an increase since 1960.
12. There have been no actual sales of land located close to the end of the runway and subject to low flights of jet aircraft. A number of sales provide information as to values prior to commencement of jet flights, and also current values outside the area of jet operations. There have been a very few sales in the areas more distant from the runway, but still subject to annoyance and interference from jet operations. Certain of these sales are beyond, or adjacent to tracts here in suit, and one tract involved in this action was sold after suit was brought. There is no evidence, except expert opinion as to what the sale price of those tracts would have been if such tracts were not subject to jet flights.
The record of sales provides little definite, pertinent data with respect to the effect on market value of low flights of jet aircraft, especially in the area near the end of the runway where the jets pass over at low altitude. The appraisals of expert witnesses for both parties as to difference in market value caused by jet operations were based primarily upon the *660 individual judgment of the respective witnesses regarding the extent to which such value might be affected by the jet flights.
13. In most cases the testimony of the witnesses as to value of the respective tracts prior to commencement of jet operations was very similar. It is found that variations between witnesses were within the bounds of professional judgment. The disagreement arises in the appraisal of fair market value of the properties subject to low flights of jet aircraft after the taking of a flight easement.
Mr. Thomas based his appraisals on a variety of factors. These included a study of writings on the subject of appraisal of flight easements; a study of real estate values and comparable sales in the immediate area; and personal experience of over thirty years in appraisals of rural properties, both for land owner and condemnor, including partial takings and easement interests.
Based upon the studies made by Mr. Thomas, he prepared roughly defined zones of decreasing disturbance from jet operations traveling outward in all directions from the Base. Frequency of flights passing over, direction and distance from the runway, height of aircraft as they pass over, and similar factors tend to place a particular tract within a zone of greater or lesser disturbance. The amount or percentage of appraised decrease in value caused by low-flying jet aircraft is obviously affected by the zone of disturbance in which the particular tract is located.
Mr. Hoover based his appraisals primarily upon his judgment as to difference in fair market value for sale purposes, drawing upon his experience of over 30 years as a banker and real estate dealer in the community, and his personal familiarity with most of the properties in suit.
Mr. Lynde and Mr. Aarant, appraisers for the defendant, concluded that only those tracts wholly or partly within the clearance easement area suffered a decrease in value from low-flying jet aircraft. Except for a nominal damage given Tract No. 23 (Kilhoffer), their appraisals of all tracts outside the clearance easement area were the same before and after the taking of an easement of flight. Each of these witnesses conceded that the large jets taking off from and landing at *661 the Base have caused substantial noise, disturbance, and discomfort outside the clearance easement area, and that they have interfered with the use and enjoyment of the property. However, the defendant’s appraisers have assumed that the jet airplanes either did not cross tracts located outside the clearance easement area or, if the aircraft did pass over such properties, they did so at elevations in excess of 500 feet. These witnesses, although qualified for the task assigned, relied to a great extent upon information and instructions received from counsel for defendant, and Air Force Base personnel. In some instances, they did not verify their conclusions by personal observation or independent personal investigation.
The expert witnesses all agreed that the noise and disturbance from the large jet planes would be substantially the same whether they were flying slightly less than or slightly more than 500 feet above the ground.
It appears that the appraisals made by defendant’s expert witnesses with respect to tracts outside the clearance easement area were founded upon a conclusion that the owners, as a matter of law, had no right of recovery, rather than upon a factual determination that the tracts had or had not suffered decrease in value from jet operations.
14. Actual sales of lands in the vicinity of the Base which give some indication of market value and market conditions included:[12]
(1) Bowman Tract, S/2 Sec. 11-10N-16W, 320 acres, sold 1981 for $75,500, or $236 per acre, indicating current value of farmland away from jet flights.
(2) Unnamed sale, SE Sec. 11-10W-19W, 160 acres, sold 1961 for $38,500, or $240 per acre, also indicating current value of farmland away from jet operations.
(3) Duncan-Edler, N/2 NW Sec. 1-10N-20W, 78.58 acres, sold 1961 for $25,000, unimproved, or $313 per acre, also indicating current value of farmland away from jet operations.
*662 (4) Simons-Schnaberger, SW Sec. 29-11N-19W, 159 acres, sold in 1954 for $27,750, or $143 per acre, which, if adjusted at the State average increase in farmland value, would equal $184 per acre at trial. Sale was prior to jet operations.
(5) Hoffman-Schneherger, NE Sec. 28-10N-19W, 160 acres, sold in 1957 for $31,000, or $192 per acre, which, if adjusted at the State average increase, would equal $214 at trial. Sale was prior to jet operations. Tract is located just southwest of the south end of the runway, and adjoins tracts 17 (Davis), 19 (Smith), and33 (Walters).
(6) Perkey-Duree, N/2 NE Sec. 27-10N-19W, 80 acres (less one-half minerals) sold 1956 for $16,000, or $200 per acre, which, adjusted, would equal $222 per acre. Sale was prior to jet operations. Tract is just southeast of the south end of the runway, and adjoins tracts 15 (Greteman), 22 (Wallis), and 18 (Higginbotham).
(7) Armstrong-McAllester, SE Sec. 16-10N-19W, 160 acres, sold in 1957 for $35,000 or $218 per acre, which, adjusted, would equal $240 per acre. Tract was unimproved, and sale was prior to jet operations. Tract is at the southwest comer of the Base, just west of the approximate center of the runway.
(8) Francis-Spradlin, part W/2 SW Sec. 9, and W/2 NW Sec. 16-10N-19W, 134.75 acres, sold September 1, 1958, for $38,500, or $280 per acre. Sale date was contemporaneous with first jet flights. Tract is located about one mile west alongside the northern portion of the runway, and not subject to jet flights of low altitudes.
(9) Latimer-Carpenter, N/2 SW Sec. 25-11N-19W, 80 acres, sold in 1959 for $14,750, or $185 per acre. Tract is located about two and three-quarters miles north and one and three-quarters miles east of north end of runway. Improvements were poor and a creek across the property renders all but 20 acres untillable. It is on a highway.
(10) Guthrie-Haggard, NW NE Sec. 4-10N-19W, and W/2 SE Sec. 33-11N-19W, 120 acres, sold May 1959 for $21,000, or $175 per acre. This is Tract No. 7 (Guthrie) in this action. At the sale date it was subject to interference from low-flying jet aircraft. The improvements were far above average. If it were not for jet aircraft operations, it *663 would have sold for $27,500 to $28,000, or $230 to $233 per acre.
(11) Carpenter-Hoknke, SE and E/2 SW Sec. 28-11N-19W, 240 acres, sold in October 1958 for $37,000, or $154.17 per acre. Tract adjoins Tract No. 8 (McAdams) on the west and Tract No. 12 (Phillips) on the south. Sale was contemporaneous with first jet flights. The seller was in financial difficulty, which affected the sale price.
(12) Spitz-Guthrie, SW Sec. 34-11N-19W, 160 acres, sold in 1957 for $15,000, or $94 per acre. Sale was prior to jet operations. This is part of Tract No. 3 (Guthrie) in this action. Improvements were poor, and the tract is traversed by a creek, about half being tillable.
(13) Hines-Jones, S/2 NW Sec. 2-10N-19W, 80 acres, sold May 1959 for $12,500, or $150 per acre. Sale was in partition of an estate. Tract is located a half mile east of Tract No. 3 (Guthrie) and about one mile north and one mile east of the north end of the runway.
(14) Simons-King, SE and E/2 SW Sec. 4-10N-19W, 240 acres, sold in 1954 for $36,000, or $150 per acre, which, if adjusted, would equal approximately $190 per acre. Sale was well prior to jet operations. Tract adjoins Tract No. 1 (Merz) on the west.
(15) McDaniel-Walters, SW and W/2 SE Sec. 21-10N-19W, 240 acres, sold in 1955 for $42,000, or $175 per acre, which, if adjusted, would equal approximately $220 per acre. Sale was well prior to jet operations. Sale tract is part of Tract No. 33 (Walters) in this action.
(16) Hicklin-Loftis, W/2 NE Sec. 9 and SW SE Sec. 4-9N--19W, 120 acres, sold in 1957 for $15,000, or $125 per acre. Tract is one-half mile west of Tracts Nos. 31 and 32 (Guthrie) in this action. Sale was prior to jet operations.
(17) Perky-Johnson, W/2 SE Sec. 9-9N-19W, 80 acres, sold in May 1959 for $16,000, or $200 per acre. Tract is one-quarter mile west of Tracts Nos. 31 and 32 (Guthrie) in this action, and is located three and a half miles south and one-half mile west of the south end of the runway.
(18) Pearl-Shrect, E/2 NE Sec. 8-10N-19W, 80 acres, sold in 1961 for $20,000, or $250 per acre. Tract is one and *664 a half miles west of the northern portion of the runway, and is unimproved.
(19) Rainbolt-Edler, SE Sec. 21-11N-19W, 160 acres, sold in 1961 for $40,000, or $250 per acre. Tract adjoins Tract No. 11 (Dugger) and Tract No. 12 (Phillips) on the north. The purchaser does not occupy the property.
The quality of land varies considerably within the area, which means that very valuable land and relatively poor land often exist in close proximity. The nature and value of improvements also varies widely. As a result, in determining whether a sale is fairly comparable, a specific comparison must be made with respect to both the land and the improvements.
15. The highest and best use to which the tracts of land in suit could reasonably be devoted is the use to which they have been devoted, namely, diversified farming operations, raising cotton, grains, livestock, dairy cattle, or a combination of such operations. For their best use, the properties would be used as a residence and homestead by the owner, with improvements designed to provide an adequate farm residence for the owner and his family. Some of the tracts have no house or other improvements and are operated by tenant farmers who do not live on the farms.
16. It is found that the defendant has taken a permanent easement over each of the individual tracts of land remaining in suit, with the exception of Tracts Nos. 9,11,12,14, and 27. The easement is for flight of jet aircraft and aircraft of other types, in taking off and landing at altitudes below 500 feet above the ground, at the Clinton-Sherman Air Force Base. The plaintiffs, owners of the respective tracts, have received no compensation for the easements which have been takien by defendant.
The process of taking by defendant began with the first flights of large multijet bombers and tankers hi the year 1958. The taking was complete and the consequences of such taking became definite and measurable as to all tracts mentioned in this finding by July 1, 1959.
17. The amounts of decreased value resulting from the taking by defendant proposed in findings submitted by the parties are set out in the following tabulation, column I *665 being plaintiffs’ proposals and column II being those of defendant. Based on the record, it is found that the fair market value of each of the tracts here in suit has been decreased, by virtue of the taking of easements of flight, by the amounts, if any, set out in column III below:

CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs, owners of tracts 1, 2, S, 4, 5, 6, 7, 8, 10, 13,15,17-18, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32 and 33 at the time of the taking of easements of flight, named in finding 1, are entitled to recover, and it is adjudged and ordered that these plaintiffs recover of and from the United Staltes the respective sums set forth in column III of the schedule of compensation in finding 17 plus an amount computed at a rate of four (4) percent per annum from July 1, 1959 to date of payment, all as part of just compensation for the taking. It is further concluded that upon prompt substitution of a proper party for tract 19, such party will be entitled to recover and a proper order will be entered. It is further concluded that the plaintiffs who are the owners of tracts 9,11,12,14 and 27, named in finding 1, are not entitled to recover and as to them, the petition is dismissed. Further, the petition is dismissed as to plaintiffs (36) Clyde B. Price (claim withdrawn), (37) William N. Price (claim withdrawn), (32) Kenneth M. Peterson (deceased), and (14) J. M. Guthrie (not an owner at time of taking).
*666 It is further concluded that, as a condition of judgment, defendant is vested with a permanent easement of flight, with airplanes of 'any character, over each of tracts 1-8, 10,13,15,17-19, 20-26, and 28-33 (inclusive), at elevations equal to and above the glide angle plane as to those tracts within the clearance easement area, and for those tracts not within the clearance easement area, at heights measured by the same ratio as the glide angle plane. Plaintiffs will execute and deliver to defendant deeds describing and conveying the interests so taken.
It having been brought to the attention of the court that Pearl Smith was substituted as party plaintiff for E. E. Smith, deceased, owner of tract 19, it was ordered on February 28, 1964, that judgment be entered for Pearl Smith (43) for $5,000, plus an amount computed at the rate of four (4) percent per annum from July 1,1959, to date of payment, all as part of just compensation for the taking by defendant of easements of flight. It was further ordered that plaintiff will execute and deliver to defendant a deed describing and conveying the interests so taken.

 Originally 33 tracts, but tbe tract 16 claimants have withdrawn from the action.

 The Trial Commissioner has found against plaintiffs on tracts 9, 11, 14, and 27 because of insufficiency of proof that overflights occurred at an elevation of less than 500 feet and against them on tract 12 because there was no adequate showing of a diminution in market value.

 Tracts 1, 2, 3, 4, 5, 8, 17, 18, 19, 20, 23 and 25.

 At the south end of the runway, the Base has Instrument landing system (ILS) equipment which transmits electronic signals to an instrument on the aircraft which informs the pilot of Ms position. ILS is designed only to inform the pilot; it exercises no control over pilot action.

 Tracts 1, 2, 3, 17, 18, 19, 20, and 21 lie in tlie clearance easement area. The owners of these parcels have already recovered for the taking of the clearance easement. They may also recover for the taking of avigation easements to the extent that the fair market value of their land has been further diminished by the flight of aircraft at low altitudes. See e.g., United States v. 48.10 Acres of hand, 144 F. Supp. 258 (S.D.N.X. 1956) ; United States v. 4.43 Acres of Land, 137 F. Supp. 567 (N.D. Tex. 1956).

 Defendant believes its position Is bolstered as to tract 10 because the Commissioner has found no taking with respect to tracts 9, 11 and 12 which lié to the west of tract 10 at the same distance from the end of the field. Therefore, defendant says, tract 10 is the one least likely to be subject to overflights. We agree that this factor has some bearing, but it is hardly conclusive. The difference in treatment stems from the difference in individual proof. As to tract 12, the Commissioner did not find that there were no overflights, but merely that there was insufficient proof of diminution of value. Why the proof was insufficient for tracts 9 and 11 is a matter of conjecture, but it is entirely permissible to recognize that proof sometimes fails for reasons unrelated to the basic underlying facts.

 Defendant also claims that the Trial Commissioner incorrectly took into consideration certain alleged interferences with aerial crop spraying due to Base activity. The Commissioner actually gave this little weight and deemed it of little significance. Assuming that the Trial Commissioner should not have given any weight to this factor, we do not think it was reflected in his findings of the amounts of just compensation to he awarded.

 Since plaintiffs have not excepted to the Commissioner’s findings and recommendations on this point, we are directing the deeds to refer to aircraft “of any kind” without deciding whether such a direction would be made if a proper exception had been taken.

 (1) Robert E. Davis, (2) C. C. Dugger, (3) Harold Evans, (4) Mary J. Evans (6) Thelma Evans, (6) Dora Greteman, (7) Edward Greteman, (8) Brank H. Greteman, (9) Jocie Martha Greteman, (10) Allen Guthrie, (11) Bernice Guthrie, (12) Dora Guthrie, (13) J. E. Guthrie, (14) J. M. Guthrie, (15) W. E. Guthrie, (16) Charles J. Higginbotham, (17) Jennie P. Higginbotham, (18) Leo Hoffman, (19) Ella B. Hoover, (20) Donald D. Johnson, (21) I. M. Johnson, (22) Joyce Johnson, (23) John Kerkhoff, (24) Bernard M. Kilhoffer, (25) Donna J. Kilhoffer, (26) Bines M. McAdams, (27) Goldie McAdams, (28) Leo J. Merz, (29) Louis T. Merz, (30) Brank B. Morgan, (31) Juanita Nagel, (32) Kenneth M. Peterson, (33) Ruby Peterson, (34) Noah O. Phillips, (35) Troy O. Phillips, (36) Clyde B. Price, (37) William N. Price, (38) B. P. Prickett, (39) Prank Prickett, (40) John S. Prickett, (41) Wanda Riggins, (42) Bertha Rogers, (43) E. E. Smith, (44) Eddie Walters, (45) Henry Walters, (46) Johnnie Leo Walters, (47) G. J. Wallis, (48) Louie A. Whittenburg.

 The figures as to height of lower safety limit are approximate, interpolated from evidence that the lower safety limit was 180 feet above the ground at one nautical mile (6,080 feet) from the end of the runway, 392 feet at 12,160' feet, and 604 feet at 18,240 feet. Also, the lower safety limit is 85 feet below the GCA flight parth at 6,080 feet and 138 feet below at 12,160 feet. The lower safety limit was not shown on defendant’s charts, offered as exhibits.

 It will be noted that sales numbered 1 through 9 listed In this finding and sales 12, 14, 15, and 16 relate to properties -which are either a considerable distance from the Base and not subject to jet flights at low altitudes or were sold prior to jet operations in the area.