CoweN, Chief Judge,
delivered the opinion of the court:
In this suit, plaintiffs seek to recover back salaries allegedly owed to them as a result of demotions and separations made through reduction-in-force procedures by the Department of the Navy at the Mare Island Naval Shipyard in Vallejo, California (hereinafter referred to as Mare Island). Seven of the nineteen plaintiffs are veteran preference eligi-bles. Plaintiffs contend that the work they were performing at Mare Island was transferred to the Oakland Naval Supply Center (hereinafter referred to as Oakland), and, therefore, there was a transfer of functions within the meaning of 5 TJ.S.C. § 861 (1958 Ed.) (Section 12 of the Veterans’ Preference Act), applicable Civil Service Regulations, and pertinent Navy Civilian Personnel Instructions. Plaintiffs’ basic position is that, instead of being demoted and separated by a reduction in force at Mare Island, they should have been transferred with their functions to Oakland. Plaintiffs’ *641 claim is not founded on procedural errors but goes to the correctness of the agency determination on its merits.
The actions complained of came about as the result of the Navy Department’s reorganization of its supply system to remedy the critical storage problem created by the excess material procured during World War II and the Korean conflict and the return of material from the Pacific Ocean areas. The supply system was categorized by the Navy by various types of materials and distinguished by various alphabetical designations used with the word “cognizance” or “cog”. Sometime in late 1958, the Navy began a program to define and re-position the supply materials or stocks at its installations in the San Francisco Bay area as a part of the reorganization plan. The program affected Mare Island, the San Francisco Naval Shipyard, and Oakland, as well as San Diego, Pearl Harbor, and other installations within the continental United States. At the completion of the program in 1960, both Mare Island and San Francisco showed a net decline in the stock of various cog items, while Oakland showed a net gam, though-it had lost some items also. The net gains and losses were not caused entirely by a shift of cogs from Mare Island to Oakland, but were due in part to the introduction of new items of supply materials to the shipyard stocks and to the fact that many items were declared excess or obsolete and were either donated to various welfare activities, sold as surplus, or scrapped.
As a result of the losses of various cogs and materials at Mare Island and the institution of cheaper and more efficient methods of packaging and storing the various cogs, there was a general decrease in the volume of supply work being performed both at Mare Island and Oakland. Both installations were required to effect reduction-in-force actions during 1959 and 1960 to eliminate personnel considered to be in excess of the continued need of the installations.
Plaintiffs were the subjects of adverse employee actions, after which they took the necessary steps to appeal their cases to the Twelfth Civil Service Kegion of the Civil 'Service Commission. The demotion actions affecting plaintiffs Blood and Schell were sustained, and the decision was affirmed by the Commission’s Board of Appeals and Keview. *642 The appeals of all other plaintiffs were sustained by the Region in a decision dated April 25, 1960, on the indicated ground that the transfer of certain materials constituted a transfer of functions and, therefore, that 17 of the plaintiffs should have been allowed to transfer to Oakland. The Region based its decision on an interpretation of Section 170.9-4b (3) of the Navy Civilian Personnel Instructions, which provided that “when it is not possible to differentiate between personnel working on that portion of the work subject to reduction in force due to cancellation of work and that portion being transferred, the entire action will be handled as a transfer of function”.
The Mare Island Commander appealed the Region’s decision and it was reversed by the Civil Service Commission’s Board of Appeals and Review, after consideration of the administrative record and the supplemental briefs filed by the parties.[1] The Board affirmed and amplified its previous decision in a letter dated March 23, 1961, after a review of the case at plaintiffs’ request. In these opinions, the Board found that the above-quoted Navy Civilian Personnel Instructions Section l70.9-4b(3), which the Region relied upon as the basis for its decision, was not consistent with Civil Service Regulation § 20.8 (a), 5 C.F.R. § 20.8 (a) (1959 Ed.), which requires that:
Before any reduction in force is made in connection with the transfer of any or all of the functions of an agency to another continuing ’agency, all competing employees in positions identified with such function or functions shall be transferred to such continuing agency without change in tenure of appointment. [Emphasis added.]
The Board held that, although work had been transferred from Mare Island, there was no transfer of functions within the meaning of the regulations but merely a reorganization of the character of the functions being performed at Mare Island. As the principal basis for its decision, the Board stated that “the decisive factor in these cases is that the affected employees of the Supply Department at Mare Island *643 Naval Shipyard cannot be specifically identified with any function being transferred to Oakland Navy Supply Center * * * nor can these employees be specifically identified with the processing of any single supply material cognizance handled at Mare Island”.
We need not decide whether there was in fact a transfer of functions, for we agree with the Board that none of the plaintiffs was sufficiently identified, under the statutory and regulatory criteria, with the work and materials which were transferred to Oakland.
Our Trial Commissioner found that the ultimate findings and conclusions of the Civil Service Commission are supported by substantial evidence. The Commissioner further found that “the work performed by plaintiffs herein could not be sufficiently identified with any particular function so as to entitle plaintiffs to transfer to Oakland”.
In addition, the Commissioner found that “there is no evidence in the record to establish that plaintiffs spent more than half of their time working on materials that were transferred to Oakland”. This finding is consonant with that part of the Navy Civilian Personnel Instructions Section 170.9-4, which provides, in essence, that an employee is identified with a function if he spends all or a major part of his time on the items or work being transferred, or, if in the case of a service or support position such as a laborer-cleaner, more than half of his duties are devoted to the organization being transferred.
Plaintiffs have failed to discharge the burden of sustaining their exceptions to the Commissioner’s findings. Indeed, plaintiffs’ exceptions to his findings may be disregarded because the exceptions fail to comply with our Rule 58(c), in that no references are made in the exceptions to the parts of the record relied upon by the plaintiffs in support thereof.
On the basis of the Commissioner’s findings and the presumption of their correctness in the absence of a strong affirmative showing to the contrary, Robert E. Davis et al. v. United States, 164 Ct. Cl. 612 (1964), and cases cited therein, we hold that the decision of the Board of Appeals and Review will be accorded the finality due it where there is no showing that the decision was arbitrary or is not supported *644 by substantial evidence. Keim v. United States, 177 U.S. 290 (1900); Eberlein v. United States, 257 U.S. 82 (1921).
Plaintiffs’ reliance on our recent decision in Colbath v. United States, 169 Ct. Cl. 414, 341 F. 2d 626 (1965), is misplaced. In that case, the evidence showed that there was in fact a transfer of fmictions, that the employees affected were identified with the transferred functions and would continue to work on the same and similar material as that on which they worked prior to the transfer. Plaintiffs have not made such a showing in this case. The main challenge in Oolbath went to the right of the agency to dismiss employees who refused to accompany their transferred functions, a right which we upheld.
Plaintiffs’ petition is dismissed.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and arguments of counsel, makes findings of fact as follows:
¡Í. This action is brought by 19 employees and former employees of the Department of the Navy at the Mare Island Naval Shipyard, Vallejo, California (hereinafter referred to as Mare Island). These plaintiffs and their respective job classifications at Mare Island at the time of the various employee actions complained of herein are listed as follows:
1. Ersel O. Barnes, Crater-Packer
2. Henry A. Bassford, Crater-Packer
3. LenaT. Bias, Stock Control Clerk
4. George D. Blood, Quarterman Crater-Packer
5. Richard A. Carroll, Leadingman Crater-Packer
6. Emma Corrington, File Supervisor
7. Winnie C. Creegan, Accounts Maintenance Clerk
8. Edward Harris, Crater-Packer,'3rd Step
9. Lestle W. Ivy, Leadingman Laborer
10. Gerald E. Kelly, Head Stockman
11. Robert E. Lee, Stockman
12. Clarence L. Mason, Warehouseman
13. Walter McAlister, Crater-Packer
14. Lillian J. Molander, Stock Control Clerk
15. Elvin Ogbum, Crater-Packer
*645 16. Edward T. O’Malley, Head Stockman
17. Alfred J. Pitts, High-Lift Truck Operator
18. David It. Schell, Quarterman Crater-Packer
19. Teodorico A. Soriano, Laborer (Cleaner)
2. Of the 19 plaintiffs, only the following are veteran preference eligibles: Ersel O. Barnes, Henry A. Bassford, Eichard A. Carroll, Edward Harris, Walter McAlister, Elvin Ogburn, and Alfred J. Pitts.
3. Plaintiffs are seeking to recover loss of part or all of back salaries on the grounds that their demotions or separations were unlawful. Plaintiffs contend that the work they were performing at Mare Island constituted part or all of certain functions at Mare Island which were transferred to the Oakland Naval Supply Center (hereinafter referred to as Oakland) and that as a result of such transfer of functions, they were demoted or separated by reduction in force instead of being transferred with their functions to Oakland in accordance with pertinent Civil Service Eegula-tions and Navy Civilian Personnel Instructions (hereinafter referred to as NCPI).
Plaintiffs do not assert any procedural irregularities with respect to the demotion or separation actions taken.
4. Defendant denies that any back salary is due and owing plaintiffs, or any of them, and denies that any transfer of functions at Mare Island occurred which entitled plaintiffs to be transferred to Oakland. Defendant asserts that the employee actions of which plaintiffs complain were the direct result of bona fide reductions in force at Mare Island, and that plaintiffs were accorded in connection therewith all the rights and privileges provided under pertinent statutes and regulations.
5. From the standpoint of field activities, the supply system of the Department of the Navy consists of the maintenance and operation of various shipyard supply centers, various supply depots, and various programs of inventory control managers who supervise various types of materials in the supply system. The various types of materials are categorized and distinguished by various alphabetical designations used with the word “cognizance” or “cog”. P cog is the classification for submarine repair parts, H cog for ship *646 parts, Z cog for ordnance components, A and J cogs for major ordnance, F cog for major electronic components, G cog for general stores, N cog for small electronic parts, S cog for major shipboard material, and W cog for fuel oil. The cogs encompass the entire range of all items in the supply system and run the gamut of the alphabet.
The various field activities have specifically designated echelons of supply for certain cogs in order to support shore and/or off-shore installations. These designated echelons are classified as distribution points, primary stock points, and secondary stock points.
Distribution points carry stock for the supply support of designated continental and extra-continental primary stock points, and may also be assigned supply support responsibility for secondary stock points in the immediate area, extra-continental secondary stock points, fleet units, and/or yard and district craft.
Primary stock points carry stock for their own consumption, for designated continental and extra-continental secondary stock points, and may also support fleet units and/or yard and district craft.
Secondary stock points carry stock for their own consumption and for the support of assigned yard and district craft and aircraft. The source of supply of the secondary stock point is normally a primary stock point or a distribution point.
6. The Navy supply system, as it exists today, was established by major reorganization in 1947, and ever since that time there have been various management improvements in the overall program and the various field activities. Commencing in the early part of the 1950’s, a continuing critical storage problem existed in the San Francisco Bay area in connection with the operation of supply centers at the Mare Island Naval Shipyard, the San Francisco Naval Shipyard, and the Naval Supply Center, Oakland, due to the large quantities of materials procured during World War II and the Korean War, and the return of materials from Pacific Ocean areas. As a result, the Navy rented extensive storage facilities to house materials. In 1955 or 1956 this practice was criticized by the General Accounting Office which recom *647 mended that the Navy take appropriate steps to reduce the amount of rented storage space, refine and purify its stocks, and sell or donate obsolete or no longer required stocks.
7. During 1958 and 1959, various plans and proposals for implementing the GAO recommendations were advanced, some proposed within the Navy’s Bureau of Supplies and Accounts (BtjSaNdA) and others submitted by officials at the Mare Island, San Francisco, and Oakland installations. None of these plans was ever officially approved, and no plan was ever adopted or issued under the official name of the Bay Area Supply Support Plan. Such name has been used extensively in referring to the program of repositioning of stocks and other changes in the Navy supply activities, which resulted from consideration of the various plans and proposals submitted.
8. As part of the overall program of refinement and repositioning of stocks, hereinafter described in detail, the Navy’s Bureau of Ships and Bureau of Supplies and Accounts issued their joint letter, dated July 2, 1959, to the Commanding Officers of the Mare Island, San Francisco, and Oakland installations, containing directives as follows:
Subj: Supply Support in the San Francisco Bay Area Bef: (a) busi-iips/btjsaNda joint ltr Ser 731-14 43/ 5817 A3 of 14 Jan 1959
(b) MiNs/sFNs/NSCO joint ltr of 24 Apr 1959
1. In accordance with reference (a), reference (b) reported the results of detailed feasibility tests of plans for realignment of supply support patterns in the San Francisco Bay Area. After a thorough study of these plans, the Bureau of Supplies and Accounts and the Bureau of Ships have determined that the optimum support plan is one which will meet the following criteria:
a. Provide that both shipyards have responsibility and authority for control of material availability and procurement required in support of their industrial effort.
b. Beduce non-industrial supply workload at the shipyards.
c. Beduce range and depth of selected stocks at the shipyards not directly related to industrial operations.
d. Accomplish maximum personnel savings without hampering supply support in the Bay Area.
*648 e. Involve a minimum of material movement.
2. A Bay Area support agreement has been jointly developed at the bureau level and adopted by Bureau of Supplies and Accounts and Bureau of Ships. This joint agreement is designed to meet the above criteria without publication of a formalized plan. This agreement will be implemented commencing 2 July 1959 through a series of individual actions initiated by Bureau of Supplies and Accomits in collaboration with Bureau of Ships as follows:
a. Direct the discontinuance of routine redistribution from shipyard stocks.
b. Prescribe a tailored support plan for each material category. It is the intention that the shipyards will remain primary stocking points for certain cogs and classes of material as agreed upon between the shipyards and the supply demand control points. The shipyards will be considered as “modified” primaries in that they will not normally be called upon to serve as distribution points.
c. Eeduce material input to the shipyards.
d. Determine and direct disposal actions.
e. Determine and direct any required bulk redistribu-tions.
3. This agreement will impose certain new requirements on the Bay Area activities, some of which are:
a. The Naval Supply Center will reserve material in stock and will procure and reserve other materials when requested by the shipyards.
b. The Naval Supply Center will bill Navy Industrial Fund directly for appropriate items immediately chargeable to shipyard end use.
c. The Naval Supply Center will normally consider shipyard demands as replenishable.
d. The Naval Supply Center will provide information to the shipyards as to the availability of stocks at the Naval Supply Center.
e. The shipyards will follow prescribed criteria for operating levels of supply in determining range and depth of stocks of items with repetitive usage.
It is recognized that specific actions have already been taken or planned to date concerning changes in responsibility such as those enumerated above. To the degree to which the bureaus have knowledge of these actions, they are considered compatible with the plan of action being implemented.
4. During the course of the phasing out of the supply functions in the naval shipyards as planned, the trans *649 fer of function regulations outlined in NCPI 170.9-4 should be observed when identifiable supply functions are transferred to other organizations or activities.
5. It is considered that complete implementation of this joint busaNda/buships agreement as indicated above will produce maximum savings commensurate with supply system responsiveness to shipyard industrial requirements.
9. By letter dated August 7,1959, the Bureau of Supplies and Accounts issued and distributed to the various echelons of the Navy supply system the following set of instructions for implementation of the directives contained in the joint letter quoted in finding 8:
Subj: Supply Support in the San Francisco Bay Area Bef: (a) Joint buships/busanda ltr, buships ND/12
Ser 731-470 busanda L3/6145 A3 of 2 Jul 1959 (NOTAD
(b) busanda Manual, par. 21051-5
1. Purpose. In accordance with reference (a) to realign supply support responsibilities in the San Francisco Bay Area for material under the cognizance of the Ships Parts Control Center, Electronics Supply Office, General. Stores Supply Office, Ordnance Supply Office, and the Submarine and Eeactor Parts Supply Office.
2. Background. The continuance of more than one major supply distribution activity in the Navy industrial-supply complexes has been studied by busanda for a number of years. Some measure of consolidation of inventories and supply functions has been indicated as providing a means for reducing both stock investment and maintenance and operating costs without lessening shipyard activity performance standards. As a result of a joint busanda/buships study of plans for the realignment of the supply support pattern in the San Francisco Bay area, it was determined that the most effective realignment is through an inventory improvement program which will reduce the non-industrial workload and thus enable both shipyards to concentrate their efforts on the support of their industrial missions by relieving them of supply system and fleet support responsibilities.
3. Discussion. A basic assumption is that each of the two shipyards must have available a completely integrated organization to perform its primary mission. *650 Except for emergency issues to ships and issues to assigned yard and district craft, it is intended that the shipyards will not normally be called upon to provide supply support to other shore activities or the fleet. Each shipyard will retain its complete supply department with responsibility for providing the support required to sustain its industrial effort. Only those items necessary to support the shipyard industrial effort will be stocked at the shipyards. These objectives can be accomplished by decreasing the range and depth of items carried at Nsv Mare Island and nsy San Francisco and transferring certain supply support responsibilities to the Naval Supply Center, Oakland. Accordingly, a change in the status of the NSY Mare Island and nsy San Francisco from Primary Stock Points to Secondary Stock Points in the distribution system of the Navy Supply is necessary for items under the management control of addressees. A Secondary Stock Point, as defined in reference (b), provides each addressee sufficient latitude to establish item stocking, reporting, and procurement procedures in consonance with current individual material cognizance policies. Under this concept it is generally expected that low demand-small cube items will be stocked in accordance with established secondary stock levels on the basis of replenishment by requisition from Nso Oakland. It is further anticipated that high velocity, bulky, and special items will be stocked in accordance with addressees’ procurement policies and replenished by direct input from industry. 4. Action
a. Addressees will take immediate action to designate Nsy Mare Island and nsy San Francisco as secondary stock points.
_ b. To facilitate the prompt and orderly implementation of this action, it is requested that the addressees initiate action as follows :
(1) Range determination. In conjunction with the shipyards, determine the range of items to be stocked by the shipyards. Major consideration should be given to repair parts and components used predominantly in the industrial effort of the shipyards.
(2) Depth determination. Determine depth of items based on individual item characteristics as they relate to shipyard industrial mission support and material cognizance system inventory management policies. In order to eliminate unnecessary stock movement and to take advantage of attrition through local usage, 30 *651 June 1960 is established as the target date for item stock level goals.
(3) Excess. To preclude unnecessary movement of stock, determine the system excess position of items presently stocked at the shipyards and direct disposal action as appropriate.
(4) Redistribution. Subsequent to action taken in subparagraphs (1) through (3) above, redistribution of remaining items of system stocks will only be made to activities with valid urgent requirements which cannot be met by other regular system sources in time to meet the required delivery dates.
(5) Transfer. All stocks remaining after the above indicated actions will be transferred to NSC Oakland in such time and manner as mutually agreed among NSC Oakland, nsv Mare Island, nsv San Francisco, and addressees, but no later than 31 March 1960.
(6) Transportation. Prior to initiating bulk redistribution or transfer action, an estimate of the transportation costs involved will be submitted to busaNda.
5. Progress Reports. Addressees are requested to submit quarterly reports commencing 30 September 1959 as to progress in the accomplishment of this program. The first report should be submitted by 15 October and subsequent reports by the 15th of the month following the end of each quarter. Report Control Symbol bu-saNda 4440-64 is assigned this reporting requirement.
6. Effective date. This instruction is effective upon receipt.
10. Under date of December 29,1958 (about 6 months prior to issuance of the buships/busaNda letter quoted in finding 8), the Commandant, Twelfth Naval District, issued written instructions (12nd Notice 4401) to all Navy personnel concerned, as follows:
Subj: Supply Support of Shipyard Satellites and Ships berthed at Shipyards; revision to Ref: (a) Joint busanda-buships ltr Ser 730-34 of 7 Nov 1958
1. Purpose. To implement a change in logistic responsibility in the Twelfth Naval District for supply support by Naval Supply Center, Oakland of satellites and ships berthed at the Naval Shipyards, Mare Island and San Francisco.
2. Background. Reference (a) approved a change in logistic responsibility for support of satellites and ships *652 berthed at Naval Shipyards, Mare Island and San Francisco. Satellites and ships berthed at shipyards in the Twelfth Naval District have been designated dependents of Naval Supply Center, Oakland for supply support as set forth in this Notice. Radiological Laboratory will continue to be supported by Naval Shipyard, San Francisco until 1July 1959.
3. Effective Date. This Notice is effective on 1 January 1959.
4. Action.
a. Naval Supply Center, Oakland:
(1) Assume responsibility for logistic support for all material, except p cognizance material (see para. 5), for satellites and ships berthed at shipyards. Logistic support includes the responsibility for delivery of material to the requesting activity.
(2) Accept for processing the excess material from ships berthed at shipyards when delivered by the shipyards.
b. Naval Shipyards, Mare Island and San Francisco:
(1) Issue material if available on Priority Emergency requisitions received from shore satellites and ships.
(2) Continue to stock and provide support p cognizance material until such time as the change in logistic responsibilities for p cognizance material is implemented.
(3) Accept and process scrap, salvage, and excesses in p, ,t, p and s cognizance material turned in by ships. Provide delivery service to Naval Supply Center, Oakland for all other excess material turned in by ships.
c. Ships Berthed at Naval Shipyards in the Twelfth Naval District:
(1) Submit all requisitions, except for p cognizance material, direct to Naval Supply Center, Oakland. Priority Emergency requisitions may be submitted to the nearest naval shipyard for issue by the shipyard if material is in stock.
(2) Requests for p cognizance material will be submitted to the nearest shipyard.
(3) Turn in scrap and salvage to the shipyard at which berthed.
(4) Turn in excess in e, j, p, and s, cognizance material to the shipyard at which berthed for processing by the shipyard.
(5) Turn in all .other excess material to Naval Supply Center, Oakland for processing. Arrange delivery of this excess material to Naval Supply Center, *653 Oakland with, the Supply Department of the shipyard at which berthed.
d. Shipyard Satellites: Submit requisitions for all material direct to Naval Supply Center, Oakland. Priority Emergency requisitions may be submitted to the nearest naval shipyard for issue by the shipyard if material is in stock.
5. p Cognizance Material. A change in the distribution system for p cognizance material is contemplated. This prospective change relates to the transfer of all or part of tne present responsibilities of the Naval Shipyards, Mare Island and San Francisco, to the Naval Supply Center, Oakland. Notice of any change in p cognizance support responsibilities will be promulgated at a later date.
6. Cancellation. This Notice is cancelled when above logistic support change is incorporated into the btjsaNda Manual and for record purposes on 1 September 1959.
11. Under date of February 26, 1959 (about 4 months prior to issuance of the btjships/bus anda letter quoted in finding 8) the Commanding Officer, Submarine Supply Office, Philadelphia, Pennsylvania, advised the Chief, Bureau of Supplies and Accounts, as follows:
Subj: Distribution Plant for “p” Cognizance Material
at West Coast Activities; implementation of Ref: (a) stjbsupo Conf ltr PI A L8-5 Ser 039 of 17 Nov 1958
(b) CO NSC Oakland ltr 801 of 1 Dec 1958 (NOTAL)
(c) busandanote 4440 of 10 Feb 1959 (Notal)
(d) bhships/busaNda Joint ltr buships NY11/ A3 (781-0) NY/9/A3 NT4-5 A3 Ser 731-14 and bttsaNda L3/5817 A3 of 14 Jan 1959 (notal)
1. Reference (a) outlines a supply support pattern for “p” cognizance material in the San Francisco Bay Area and proposes to activate nsd, San Diego as a primary stock point for “p” cognizance material. Reference (b) sets forth a proposed plan for the realignment of supply support for submarine material within the San Francisco Naval Shipyard — Mare Island Naval Shipyard — Naval Supply Center Oakland Complex. By reference (c), cognizant Supply Demand Control Points are requested to take immediate action to avoid unnecessary stock build-ups in the San Francisco and *654 Mare Island Naval Shipyards. Eeference (d) discusses, in some detail, the overall supply support pattern in the San Francisco Bay Area and requests the development of feasibility studies with respect to certain aspects of the problems concerned.
2. In view of the fact that the distribution plan contained herein is considered to be completely compatible with the concept set forth in references (a) through (d), and in consideration of the current unsettled personnel situation of subsupo which will continue prior to the relocation of the Command to NSD, Mechanicsburg and during the transition period following such a relocation, and based on recent discussions among the Commanding Officer, Submarine Supply Office, West Coast Commands concerned, and Bureau of Supplies and Accounts, Codes OS and OL, this Command will proceed to implement subject plans as follows:
a. Naval Supply Center, Oakland, California
(1) In conjunction Avith San Francisco and Mare Island Naval Shipyards complete and implement plans to transfer all stocks of “p” cognizance material from these shipyards to the Naval Supply Center except as follows:
(a) Those items in Naval Industrial Fund Shop Stores.
(b) Limited quantities (90 days level) of fast moving items to supplement (but not duplicate) Nip Shop Stores.
(c) Those major items, specified by NSC, Oakland, which are used predominantly in the industrial effort of the shipyards. This category includes such items as battery jars, periscopes, etc.
(2) If requested, the subsupo will provide appropriate assistance in the determination of those items under paragraph 2a(1) (b) and 2a (1) (c) above which are to be retained at the shipyards. Transfer of the material included in subparagraph 2a (1) above must be accomplished in an orderly manner so as to prevent loss of control by the subsupo with resultant disruption of support of the Submarine Forces. Upon completion of material transfers, Naval Supply Center, Oakland will assume the functions of the West Coast and Pacific Ocean Area distribution point for “p” cognizance material.
b. Naval Shipyards San Francisco and Mare Island
(1) Upon direction from the subsupo, Naval Shipyard Mare Island transfer to NSD, San Diego one Composite Tender Load, consisting of approximately 5400 *655 items (increased in depth for high demand items). Approximately 675 PX tailored items for the support of SS(M)583, currently retained at Mare Island, are to be held pending receipt of shipment instructions from subsupo.
(2) In conjunction with the Naval Supply Center, Oakland, shipyards implement plans for the transfer or retention of the “p” cognizance material described in subparagraph 2a above.
(3) Upon completion of material transfers, Naval Shipyards San Francisco and Mare Island will be removed from the distribution system of the subsupo.
c.Naval Supply Depot, San Diego
(1) Upon receipt of the material described in sub-paragraph 2b (1) above, Nsd, San Diego will assume the functions of a primary stock point m the Submarine Segment of the Navy Supply System.
3. In compliance with the provisions of reference (c), the subsupo will initiate immediate action to direct future receipts of new system stocks into NSC, Oakland vice San Francisco and Mare Island Naval Shipyards.
4. Implementation of the material distribution plan described herein will result in the following advantages:
a. Alleviate crowded storage conditions at Mare Island and San Francisco Naval Shipyards.
b. Assist San Francisco Naval Shipyard in accomplishing its goal to vacate leased storage space in San Francisco.
c. Enable Mare Island and San Francisco Naval Shipyards to concentrate their efforts on the support of the industrial missions of the shipyards by relieving them of supply system and Fleet Supply Support responsibilities.
d. Improved supply support of submarines and submarine tenders in the San Diego area.
e. Reduced concentration of stocks of “p” cognizance material in the San Francisco Bay Area.
5. By copy of this letter, Naval Supply Center, Oakland and San Francisco and Mare Island Naval Shipyards are requested to commence action to effect the transfer of “p” cognizance material indicated in paragraph 2a (1) above. It is further requested that the subsupo be advised of the planned transfer schedule of classes of “p” cognizance material and the final completion date. The subsupo will provide shipment orders during the week of 9 March 1959 to accomplish the. movement of Composite Tender Load material from Mare Island to Nsd, San Diego.
*656 ,12. The implementation of the Navy’s pertinent program for refining and repositioning of stocks of material commenced in late 1958 and was substantially completed by Marcli 31, 1960. Inventories as of December 31, 1958, and March 31, 1960, show that during this period Mare Island’s stock of various cog materials (a, e, g, h, j, N, p, s, w, and z cogs) declined from 109,860 items to 39,098, or a net loss of 70,762 items; San Francisco Naval Shipyard’s decline on the same cogs was from 99,036 to 25,523, or a net loss of 73,513 items; and the Oakland gain on the same cogs was from 383,605 to 415,962, or a net gain of 32,357 items.
13. The net gain of cog items at Oakland during this period (32,357 items as contrasted with combined losses of 144,275 items at the two shipyards) was not caused entirely by transfer of items from Mare Island and San Francisco, but was in part due to new items introduced into the system for the particular cogs involved which had never been positioned at either of the shipyards. Many items lost by the two shipyards were sent to San Diego, Pearl Harbor, and other installations within the continental United States, all of which repositioning was directed by Navy inventory control managers as a part of the overall program. The losses at the shipyards also included substantial quantities of cog items which were declared excess or obsolete in the repositioning program, reclassified from cog nomenclature to a category designated as B-270, and either donated to health, education, and welfare activities, or sold as surplus materials under public bidding or negotiated transactions, or disposed of as scrap materials.
14. During the period from the end of December 1958 to the end of March 1960, Mare Island lost the largest number of its cog items in the g, h, sr, and p categories, with the loss of p cog materials amounting to 19,605 items, representing a decline from 22,500 to 2,895 items of p cog materials. During this period, Oakland received a large amount of p cog items, showing an increase in this category from 520 to 25,480 items, or a net increase of 24,960 items. The combined losses of p cog items at the two shipyards amounted to 27,157 items, some of which were disposed of at the shipyards as surplus or scrap. Oakland received substantial amounts of *657 p cog materials from Mare Island, but also received such materials from other installations.
After the Navy’s program of repositioning of materials had been completed, Mare Island was still a distribution point for some p cog items, those of the industrial commercial-type. This was in accordance with the directive dated June 11, 1959, of the Commanding Officer, Submarine and Reactor Parts Supply Office, which provided that effective July 1, 1959, in connection with the realignment of the p cog supply support functions of Pacific Coast activities, Oakland was designated as the west coast distribution point except for designated major industrial items for which Mare Island would continue to act as a distribution point.
.15. Commencing in 1956, the Navy supply system implemented new policies concerning the preservation and packing of materials. Preservation of various repair parts, such as h, p, and N cogs, and other materials which would become surplus or obsolete in the near future, was discontinued. The Navy also began to require that more of the preservation work be done by the commercial suppliers of the materials. Considerable changes in packaging were instituted, with substitution of lighter weight packing materials and elimination of excessively heavy containers and packing materials whenever possible, and with extensive avoidance of repackaging by use of the commercial supplier’s packaging.
16. As a result of the redisposition of materials and other above-described changes in the Navy supply system in and in relation to the San Francisco Bay area, there was a general decrease in the volume of supply work both at Mare Island and Oakland. Both installations were required to and did accomplish reductions in force during the years 1959 and 1960 to eliminate personnel considered to be in excess of the continued needs of these installations.
The reductions in force at Mare Island in 1959 and 1960 resulted in the following actions with respect to plaintiffs:
1. Ersel O. Barnes, reduced to lower grade of Helper Electrician, March 7,1960
2. Henry A. Bassford, reduced to lower grade Laborer (heavy) March 7,1960
3. Lena T. Bias, separated, January 10,1960
*658 4. George D. Blood, reduced to lower grade of Stock-man, J une 15,1959
5. Bichard A. Carroll, reduced to lower grade of Lead-ingman Stockman, March 7,1960
6. Emma Corrington, separated, January 10, 1960
7. Winnie C. Creegan, separated, January 10,1960
8. Edward Harris, reduced to lower grade Packer, January 11,1960, and then further reduced to lower grade Laborer (heavy), March 7,1960
9. Lestle W. Ivy, reduced to lower grade of Warehouseman, January 11,1960
10. Gerald E. Kelly, reduced to lower grade of Stock-man, July 18,1960
11. Bobert E. Lee, separated, January 10,1960
12. Clarence L. Mason, separated, March 6, 1960
13. Walter McAlister, reduced to lower grade of Box Maker, March 7,1960
14. Lillian J. Molander, separated, January 10, 1960
15. Elvin Ogburn, reduced to lower grade of Helper Pipefitter, March 7,1960
16. Edward T. O’Malley, reduced to lower grade of Stockman, July 18,1960
17. Alfred J. Pitts, reduced to lower grade of Laborer (heavy), January 11,1960
18. David B. Schell, reduced to lower grade of Stock-man, June 15,1959
19. Teodorico A. Soriano, separated, March 6, 1960
17. Plaintiffs Blood and Schell, who were demoted on June 15, 1959, appealed their demotions to the 12th U.S. Civil Service Begion on June 1, 1959, on the grounds that they should have been transferred to Oakland. By decision dated July 20, 1959, the 12th U.S. Civil Service Begion sustained the demotion actions of both plaintiffs Blood and Schell. Thereafter, on July 30, 1959, plaintiff Schell appealed this decision to the Board of Appeals and Beview and by decision dated March 4, 1960, that Board affirmed the 12th U.S. Civil Service Begion’s decision. Blood, however, never attempted to appeal the decision of the Begion in his case until April 30,1960, and by decision dated August 23,1960, the Board of Appeals and Beview declined to accept *659 Blood’s appeal because there was no showing that his untimely appeal was due to circumstances beyond his control.
,18. All other plaintiffs appealed their adverse actions to the 12th Civil Service Region of the Civil Service Commission, and upon review of the pertinent records and after a hearing accorded to plaintiffs, the Region, by decision dated April 25, 1960, sustained plaintiffs’ appeals holding that the reduction in force actions at Mare Island were not proper. This decision stated in pertinent part as follows:
Because the shifting of workload from Mare Island Naval Shipyard to Naval Supply Center, Oakland, California, involved a transfer of function for Cognizance Symbol p material, and since the appeal record does not disclose what personnel were concerned with the work that transferred, it is our opinion that the entire reduction in personnel should have been handled as a transfer of function. Accordingly, it is determined that the Use of Retention Preference Regulations to effect the reduction in personnel at the Mare Island Naval Shipyard was not proper. For this reason, the reduction-in-force actions resulting in changes to lower grades of some of the appellants and separations of some of the other employees may not be approved.
For this reason, it is recommended that action be taken to cancel the reduction-in-force actions adversely affecting the 32 employees who are listed on Attachment A. Those employees who were changed to lower grade should be retroactively restored to the positions in which they were serving immediately prior to their changes to lower grade. Those employees who were reassigned to other positions at equivalent representative rates of pay should be restored to the positions from which reassigned. Those employees who were separated by reduction in force should be retroactively restored to the positions from which separated. You are further requested to forward to this office within seven (7) calendar days one (1) copy of the notification of personnel action showing the corrective action taken.
19. Thereafter, by letter dated April 29, 1960, the Mare Island Commander appealed the decision of the 12th Region to the Board of Appeals and Review.
20. After a thorough consideration of the administrative record, together with supplemental briefs presented by the Navy and by representatives of plaintiffs, the Board of *660 Appeals and Review by decision dated July 15,1960, reversed the decision of the 12th Civil Service Region and upheld the Mare Island reduction-in-force actions as proper. The Board’s decision stated as follows:
This is in further reference to your appeal from the decision of the Twelfth U.S. Civil Service Region which reversed thirty-two reduction-in-force actions effected at the Mare Island Naval Shipyard in January and March, 1960.
The Board of Appeals and Review has fully considered the entire appellate record relative to these cases, including all representations which have been submitted in connection therewith by the affected employees or by their representative, and by your activity. The Twelfth U.S. Civil Service Region round that these actions involved a transfer of function in the movement of r-cognizance supply material from Mare Island Naval Shipyard to the Oakland Naval Supply Center, and that the reduction in force therefore should have been effected under transfer-of-function procedure. On this finding, the Twelfth Region reversed the thirty-two reduction-in-force actions which were appealed, and instructed retroactive restorations of the affected employees.
The Board considers that the decisive fact in these cases is that the affected employees of the Supply Department at Mare Island Naval Shipyard cannot be specifically identified with any function being transferred to Oakland Naval Supply Center by effectuation of the Bay Area Supply Support Plan nor can these employees be specifically identified with the processing of any single supply material cognizance handled at Mare Island. Work load may have shifted, but no new function was added to Oakland Naval Supply Center. Section 20.8(a) of the Civil Service Regulations states:
“Before any reduction in force is made in connection with the transfer of any or all of the functions of an agency to another continuing agency, all competing employees in positions identified with such function or functions shall be transferred to such continuing agency without change in tenure of appointment.” (Underscore supplied.)
Thus, under this section of the Commission’s regulations, the transfer-of-function procedure is not appropriate. The affected employees cannot be identified with a transferred “function”.
*661 The basis for the affected employees’ appeals in alleging transfer of function rights, and for the Twelfth Region’s reversal of your reduction-in-force actions, has been an interpretation of Section 170.9-45 (3) of the Navy Civilian Personnel Instructions, which allegedly confers upon employees an additional right to transfer by its provision that “When it is not possible to differentiate between personnel working on that portion of the work subject to reduction in force due to cancellation of work and that portion being transferred, the entire action will be handled as a transfer of function”. The Board of Appeals and Review considers that this provision of the Ncn must be interpreted in consonance with Section 20.8(a) of the Civil Service Regulations, since otherwise it would not merely confer an additional right upon employees in an activity losing workload, but would also operate to diminish the rights of employees in the activity gaining workload. If all the employees at Mare Island Naval Shipyard affected by this reduction in force were transferred to Oakland Naval Supply Center by an authority presumed to exist in NCpi 170.9-45(3), a number of employees of the Oakland Naval Supply Center would be subject to adverse actions resulting from a shift of work load with which they would have no connection. The Board does not consider that such a result was contemplated by Section 20.8(a) of the Civil Service Regulations, and although the transfer of employees not identified with a transferred function is not specifically prohibited, the Board believes that such a prohibition is implicit in the regulations, since such a transfer of all employees would over-staff the gaining agency to the point that an unnecessarily large reduction in force would be generated at the gaining activity.
The Board must hold that the regulations of the Commission are controlling, and that the affected employees were not entitled to transfer because a function with which they were identified was not transferred. Accordingly, the Board reverses the decision of the Twelfth Regional Office and remands the thirty-two cases involved, to that office for further adjudication in accordance with the applicable provisions of the Retention Preference Regulations.
21. In accordance with the remand of the Board of Appeals and Review for a determination of the application of the pertinent provisions of the Retention Preference Regulations, the 12th U.S. Civil Service Region by two decisions, *662 each dated August 4, 1960, found that in all cases remanded there had been a proper application of the applicable provisions of the Retention Preference Regulations.
22. By letter dated September 15,1960, plaintiffs by their representative requested reconsideration of the Board of Appeals and Review’s decision of July 15, 1960.
23. By letter dated March 23,1961, the Board of Appeals and Review affirmed its previous decision of July 15, 1960, and sustained the reduction-in-force actions at Mare Island. This decision stated in pertinent part as follows:
The primary and common basis for appeal in these cases has been that the actions taken resulted from a transfer of functions from the Mare Island Naval Shipyard to the Oakland Naval Supply Center during 1958 and 1959, and that the employees therefore were entitled to be transferred in status to the Oakland Naval Supply Center, rather than being subjected to the reductions in force effected at the Mare Island Naval Shipyard. As you are aware, this issue was considered by the Board of Appeals and Review in connection with thirty-one of these cases which previously have been before the Board for adjudication, with regard to those reduction-in-force actions accomplished in January and March, 1960. By a decision of April 25, 1960, the agency’s actions were reversed in those thirty-one cases upon initial appeal to the Commission’s Twelfth Regional Office, based upon provisions of the Navy Civilian Personnel Instructions which would appear to give weight to workload as an indicant of transfer of function, and which would grant transfer-of-function procedure to employees not specifically identified with any transferring function. The Board of Appeals and Review, acting upon the Shipyard’s appeal from the Twelfth Region’s decision, found that no new function was gained by the Oakland Naval Supply Center in its assumption of Shipyard workload; that, in any event, the employees involved could not be identified with any function being transferred to the Oakland Naval Supply Center, and that the controlling Commission regulation implicitly precluded the application of transfer-of-function procedure under such circumstances. Accordingly, on July 15, 1960, the Board rescinded the initial decision of the Twelfth Regional Office and remanded the cases involved to that Office for completion of its adjudication under the applicable provisions of the Retention Preference Regulations.
*663 The Board of Appeals and Review has carefully looked at its prior decision on the transfer-of-function issue in the thirty-one initial cases returned for final Board adjudication, and with regard to five additional employees who were affected by a subsequent reduction in force at the Shipyard in July, 1960. As a result, the Board has found no basis to question its previous findings of July 15,1960. Section 20.8 (a) of the Civil Service Regulations provides for the application of transfer-of-function procedure only to employees occupying positions which are identified with a function being transferred. The record reflects that no identifiable function was abolished at the Mare Island Naval Shipyard and assumed as a new function by the Oakland Naval Supply Center, with readily-identifiable positions associated with the function at the Shipyard. The reorganization which was effected by the Bay Area Supply Support Plan brought about a change in the general character of the various supply functions performed at the Mare Island Naval Shipyard, as related to individual types of material handled, lowering the extent and nature of the Shipyard’s operations within the supply echelon. As a result, a substantial amount of workload was transferred from the Shipyard. However, the Board could not agree with an interpretation of this action which would tend to give weight to “work” rather than “function” as the indicant of a transferring function, or which would extend general application of transfer-of-function procedure to all employees involved when none are identifiable with such transfer. The Commission’s Departmental Circular No. 140, Supplement No. 2, of June 23,1960, containing new definitions and guides with regard to transfers of function, did not become effective until August 22,1960, and therefore are not applicable to these cases.
These appeals have also included a general contention that the Mare Island Naval Shipyard and the Oakland Naval Supply Center, properly should have been included in a single competitive area for reduction-in-force purposes. However, the Board of Appeals and Review concurs in the decision of the Twelfth Regional Office that these activities, under the applicable regulations and instructions, are correctly established as separate competitive areas, being separate field installations which are independent in operations and administrative authorities, with staffs separately organized and clearly distinguishable from each other. Under the Regulations, an agency may permit change of duty stations in *664 a reduction in force, but it is not required to do so, and any placements between these two activities which may have occurred in prior reductions in force would not be material in determining the correctness of the separate competitive areas in the current actions.
24. However, in the case of plaintiff Carroll, the Board found that he had not been given his mandatory reassignment rights and it ordered Mare Island to take the necessary corrective action. Mare Island complied, and restored Carroll to the position of leadingman stockman.
25. With respect to plaintiffs Blood and Schell, the Board of Appeals and Review ruled that its previous final decisions of August 23 and March 4, 1960, respectively, had closed their cases.
26. Thereafter, by letter dated April 11, 1961, plaintiffs’ counsel requested the Commissioners of the United States Civil Service Commission to review the Board of Appeal’s and Review’s final decision. By letter dated May 19, 1961, the Executive Assistant to the Commissioners advised plaintiffs’ counsel that the decision of the Board had been reviewed by the Commissioners and that no error was found, and that accordingly, the previous decision of the Board was final in the matter.
27. During the period immediately preceding the reductions in force with which plaintiffs were concerned, none of the plaintiffs spent 50 percent or more of their time working on the p cog items. Indeed, there is no evidence in the record to establish that plaintiffs spent more than half of their time working on materials that were transferred to Oakland.
28. Plaintiffs Barnes, Bassford, Blood, Carroll, Harris, McAlister, Ogburn and Schell were crater-packers, with plaintiffs Blood and Schell each a quarterman, and plaintiff Carroll, a leadingman, in that general classification. Their duties involved the construction of boxes and crates for various supply materials and household effects to protect them in shipment or storage. Crater-packers also preserved and packed materials and stenciled identifying and shipping data on containers.
Plaintiffs Kelly, Lee, and O’Malley were stockmen, with Kelly and O’Malley each rated as a head stockman. Their *665 duties were to perform and be responsible for work operations of an assigned storage area relative to the physical receipt, storage or issuance of supplies. Stockman also received, checked, stored, counted, or assembled supplies of all types in accordance with established procedures and methods. They were also in charge of directing the work of assisting employees such as warehousemen, high-lift truck operators, or laborers.
Plaintiffs Ivy and Soriano were laborers, with Ivy as a leadingman laborer. They performed janitorial services, keeping assigned areas in a clean and orderly fashion.
Plaintiffs Bias, Creegan, and Molander were clerks who did general clerical work in connection with supply materials, and in inventory control.
Plaintiff Corrington was a file supervisor whose duties were to handle papers on incoming supplies and materials and maintain files thereon. She supervised a mail clerk and a file clerk.
Plaintiff Mason was a warehouseman whose duties were to perform a variety of tasks in connection with the receipt of, storage, and issuance of supplies.
Plaintiff Pitts was a high-lift truck operator whose duties were to operate electrical, diesel, or gasoline powered trucks to load, stack, and transport materials.
29. Plaintiffs Bias, Corrington, Creegan and Molander were classified as III-B, temporary indefinite employees, and as such, had no retention preference rights.
30. During the period that Mare Island was holding reductions in force as a result of the aforementioned program to refine and re-position stocks and materials, Oakland also held reductions in force as a result of this program. Had plaintiffs been accorded transfer of function rights to Oakland, only plaintiffs Barnes, Bassford, Carroll, Soriano, Mc-Alister, Ogburn and Schell had sufficient retention standing to have qualified them on a competitive basis for a job at Oakland at the same rating which they held at Mare Island.
31. The reductions in force at Mare Island were necessitated for the purpose of reducing the number of personnel to the extent that there was an excess for the continued needs *666 of that installation as a result of tlie implementation of a Navy-wide program to improve the economy and efficiency of its supply system in the Bay area.
32. Aside from the question of whether a transfer of certain functions from Mare Island to Oakland had taken place, the work performed by plaintiffs herein could not be sufficiently identified with any particular function so as to entitle plaintiffs to transfer to Oakland.
33. In the administrative consideration of plaintiffs’ claims and appeals, the TJ.S. Civil Service Commission and its Board of Appeals and Eeview reasonably found that no identifiable function was in fact transferred from Mare Island to Oakland, and that in any event there was no evidence to show that the plaintiffs could be identified with any transferring function. The record of proceedings in the Civil Service Commission shows that the ultimate findings and decision of the Civil Service Commission are supported by substantial evidence, as does the record in this case.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and their petitions are therefore dismissed.

 Plaintiff Carroll, However, was found not to Have been given Ms mandatory reassignment rights and the Board ordered Mare Island to take the necessary corrective action. The order was complied with and Carroll was restored to the position of leadingman stockman.